No. 84-489

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

FIRST NATIONAL MONTANA BANK OF
MISSOULA,

        Plaintiff and Respondent,

   -vs-

FRANK F. McGUINESS and DOROTHY F.
McGUINESS,

        Defendants and Appellants.

APPEAL FROM: District Court of the Second Judicial District,
In and for the County of Silver Bow,
The Honorable Mark P. Sullivan, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Earl M. Genzberger, Butte, Montana
        Greg J. Skakles, Anaconda, Montana

    For Respondent:

        Boone, Karlberg & Haddon, Missoula, Montana
        John L. Peterson, Butte, Montana

Submitted on Briefs: June 13, 1985

Decided: August 29, 1985

Filed: AUG 29 1985

*Ethel M. Harrison*
—————————————————————
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Appeal by Frank F. and Dorothy F. McGuinness from a judgment of the District Court, Second Judicial District, Silver Bow County, granting judgment against the McGuinnesses in favor of the First National Montana, Bank of Missoula in the sum of $337,205.35, with interest thereon at 9¼ percent interest from August 13, 1984, and directing foreclosure by sheriff's sale of the interest of the McGuinnesses in real property in Silver Bow County.

On consideration, we affirm the judgment of the District Court.

The crucial issue in this case is one of fact. That issue involves the McGuinnesses' contention that the Bank had induced the McGuinnesses to subdivide and sell their real property in return for a promise by the Bank that the interest rate on their consolidated indebtedness to the Bank would be established at 9¼ percent, and that the Bank would look only to the proceeds and sales of the subdivision tracts for the payment of the consolidated indebtedness, without foreclosure.

The District Court found that the consolidation agreement executed by the parties on January 12, 1978 was for a valuable consideration, and represented the intentions of the parties. We determine that that finding must be sustained under the evidence here, and because of that finding, other issues raised by the McGuinnesses cannot prevail.

Frank and Dorothy McGuinness are Butte natives. After his discharge from the Army, they purchased 320 acres of land

- 2 -

south of Butte in 1947. They used the property for their home and began to raise cattle. Frank was employed by the Anaconda Company as a ranch foreman after his discharge from the military until he went to work as a cattle broker. In 1966, he started his own cattle brokerage operation. In connection with his brokerage, he secured a line of credit through the Miner's Bank of Butte. By 1972, his credit line with Miner's was $225,000.00.

In 1972, Frank McGuinness acquired a one-half interest in the Missoula Livestock Auction by purchase from Delos Robbins, who was a director of First National Montana, Bank of Missoula. Upon that purchase, the McGuinnesses terminated their financing arrangement with the Miner's Bank and thereafter financed their operations with First National Montana (hereafter Bank). In 1973, they were advanced two substantial loans, one for $120,000 and another for $170,000.00. These funds were used by the McGuinnesses to satisfy their obligations to Miner's Bank and for their cattle operation. At the time the promissory notes were executed, the McGuinnesses mortgaged their Butte property to the Bank as security. Subsequent to 1973, additional funds were advanced by the Bank to the McGuinnesses and promissory notes were signed.

In 1974 and 1975, the cattle market fell dramatically, and at the Bank's insistence, the defendants sold their cattle at a loss of $250,000.00. The sale of the cattle, however, did not completely eliminate the total indebtedness to the Bank.

The Bank had sold a portion of the McGuinness loan to Seattle First National Bank, as the loans were over the Bank's lending limit. In 1976, the Seattle bank requested

that action be taken on the McGuinness loan. The Bank concluded that the property had to be sold and so notified the defendants. Under pressure from Seattle First National Bank, Robert Burke, as president of the Bank, wrote Frank McGuinness in April 1977. The letter constituted an ultimatum to McGuinness that he should make a decision on whether to sell the property in total or make sales of individual tracts of the land. He was given 90 days to consummate either the ranch sale or sales of individual tracts totaling at least $200,000.00. If that sum was not realized by that date, the McGuinnesses would be required to transfer the real property to the Bank by warranty deed or suffer a foreclosure proceeding.

Orally, the Bank had suggested to the McGuinnesses several persons who might either buy the real property or be involved in the promotion of land sales out of the real property. One of the suggested persons was Bruce Dailey, a Missoula realtor who is the nephew of Clyde Wood, an officer and director of the Missoula Bank. It appears that someone in the Bank had notified Dailey of the availability of the McGuinness property and Dailey had made written and personal contacts with surveyors and others and had inspected the property before he met Frank McGuinness. Eventually Dailey prepared projections of revenue anticipated to be received from sales of the McGuinness property by lots, after the creation of a subdivision. McGuinness apparently met with Dailey, and there were some complications in the negotiations with Dailey, because on July 25, 1977, Burke wrote to the McGuinnesses:

> As I described to you at our director's meeting of Friday, July 22, 1977 the directors were advised that you had committed preliminarily to the sale of

the ranch on a parcel basis under the general plan outlined by Bruce Dailey. Based on that proposal I told the directors that I in turn told you that the bank would forego transfer of the property from you and your wife to us or foreclosure proceedings as long as the plan was being followed and sales activity continuing. We were not aware that there was any change in your negotiations with Dailey.

You have now advised me that there is a question whether you will be able to consummate a deal with Dailey and consequently sale of the parcels of land will be further delayed. This is not satisfactory with us and probably is a disappointment to you also.

The bank does not wish to be in a position of judgment on the costs inherent in Dailey's proposal. Neither do we want to be a determinant of any of the details of your contract with him. We know that he has successfully put together similar packages in this area and that he apparently has done his homework in preparing a proposal for you but his success or failure is dependent on his own ability and a cooperative attitude on your part as the seller . . .

Dailey had prepared a projection of income expected to be received from the sales of parcels of the land, which indicated that it would take approximately 10 years for the McGuinnesses to satisfy their debt to the Bank. The Bank officers, however, testified that from their experience they would expect that because of construction, early payoffs and other reasons, they could expect to have the debt liquidated in three to four years.

The McGuinnesses agreed with Dailey to the development and sale of their property in August 1977. The property was broken down into 48 tracts. By the spring of 1978, all of the tracts were sold with the exception of 4 commercial tracts and 2 residential tracts. Those tracts were sold on contracts for sale which provided for interest at 8 percent of the unpaid balance.

On or about January 12, 1978, the Bank and the McGuinnesses executed a consolidation and extension agreement

wherein the parties agreed that as of that date the total balance owing by the McGuinnesses to the Bank was the sum of $545,647.17. The agreement provided that the aggregate indebtedness would bear interest at the rate of 9¼ percent from the date of the agreement (the earlier notes had provided for an interest rate of 10 percent); that the maturity of the promissory notes consolidated into the one indebtedness "shall be extended to June 30, 1979, at which time any balance remaining shall become due and payable;" and that "the promissory notes shall continue to be secured by the existing collateral" and further secured by an assignment of the McGuinnesses' interest in the sales contracts.

In preparing the subdivision, the McGuinnesses incurred development and other costs in the amount of $74,655.00, of which $30,000.00 was paid to Dailey for a "developers fee." Monies for the payment of these sums were provided to the McGuinnesses under loan agreements with the Bank.

Two further extensions of the maturity date for the indebtedness were executed in writing by the parties. The first extension was to June 30, 1980, and the second to June 30, 1981.

On June 29, 1980, the Bank wrote to the McGuinnesses, notifying that the Bank would no longer carry the interest rate at the 9¼ percent rate beyond June 30, 1981, that it would expect the interest rate to be 12¼ percent, and that the entire debt be liquidated by December 30, 1982. The McGuinnesses refused to pay the increased interest rate and so no further extension of the consolidated obligation was agreed to by the parties. The Bank commenced its action for foreclosure after June 30, 1981.

The McGuinnesses filed an amended answer and counterclaim to the complaint for foreclosure. They admitted the execution of the written instruments but denied that the Bank was entitled to any relief. They set up as affirmative defenses that the Bank had made representations to them that it would look only to the proceeds for the subdivision sales for satisfaction of the indebtedness; that the representations were false; and that the falsity was not revealed to the McGuinnesses until the commencement of the foreclosure action. By way of counterclaim, the McGuinnesses alleged 1) false representations brought about the payment to Bruce Dailey, and the incurrence of development costs; 2) breach of contract by the Bank; 3) breach of fiduciary duties to the McGuinnesses; 4) negligence in the selection of Dailey as the development realtor for the project; 5) loss of value in their property; and 6) loss of value in their cattle sale of $250,000.00.

The first legal attack upon the January 12, 1978 agreement by the McGuinnesses is that no consideration existed to support its validity. Their position is the McGuinnesses and the Bank had agreed in July 1977 that if the McGuinnesses would agree to the sale of their property through Bruce Dailey, and assign to the Bank the proceeds from the sales of that property, that the Bank would forebear foreclosure and establish an interest rate of 9¼ percent. The McGuinnesses contend that all of those conditions were fully complied with by them by early December 1977. Therefore, the execution of the January 12, 1978 document added new elements to an agreement which the McGuinnesses had already performed so that no new consideration was extended.

Section 28-2-904, MCA, provides that the execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument. The District Court concluded that the execution of the January 12, 1978 agreement in effect superseded and controlled all of the earlier oral agreements.

There is ample evidence of consideration here for the mutual agreements contained in the January 12, 1978 agreement. The Bank agreed to reduce its interest rate to 9¼ percent from the 10 percent rate provided for in most of the notes, and to extend the maturity date on the past-due indebtedness to June 30, 1979. The McGuinnesses agreed to assign the proceeds from the land sales contracts to the Bank, to pay interest monthly on the consolidated debt, and agreed to the new maturity date. There was a further agreement that the consolidated indebtedness would be secured by the collateral on the earlier notes. The agreement constituted a mutual exchange of promises and both parties obtained benefits and suffered detriments that did not exist prior to the contract. The agreement was therefore supported by consideration. See Rudio v. Yellowstone Merchandising Corporation (Mont. 1982), 652 P.2d 1163, 1167, 39 St.Rep. 1923, 1927, 1928; Miller v. Titeca (Mont. 1981), 628 P.2d 670, 675, 38 St.Rep. 853, 858.

The McGuinnesses also contend that the Bank is barred by estoppel from foreclosing on the subject property. McGuinnesses contend that under pressure from the Bank they were persuaded to accept a proposal for development of the property by Dailey on the promise that the Bank would not

- 8 -

foreclose and that the interest rate would be 9¼ percent. The McGuinnesses contend that their commitment to the Dailey proposal is now irrevocable since the land has been subdivided, and many sales of tracts from the property have been made. The McGuinnesses compare their situation to that in Bank of Fairbanks v. Kay (9th Cir. 1955), 227 F.2d 566. In that case, it appears that the Kays, who owed the bank on several overdue notes, negotiated with a prospective buyer for a sale which the bank approved provided that the proceeds from the sale would first go to the bank under an escrow agreement with the bank. The bank then sought foreclosure on the mortgage against the Kays, although the bank had received $11,000.00 plus in payments from the buyer and there was no default in the payments by the buyer. The District Court refused foreclosure, and the Ninth Circuit Court of Appeals upheld the District Court on the ground of promissory estoppel.

Bank of Fairbanks is distinguishable from this case. In this case, there is not only the January 12, 1978 agreement, but two written extensions of that agreement subsequently signed by the McGuinnesses. The execution of these instruments evince conclusively the agreement of the parties that the extension of the maturity date for the consolidated indebtedness could only occur upon their mutual agreement. The first essential element of estoppel usually stated is that there must be conduct, acts, language or silence amounting to a representation or concealment of facts on the part of the party to be estopped. Matter of Shaw (Mont. 1980), 615 P.2d 910, 914, 37 St.Rep. 1480, 1484. Here the language used by the parties in the written instruments are directly opposed to the McGuinnesses' contentions: in each

- 9 -

case the new maturity date for the consolidated obligation is specifically set forth. The McGuinnesses' claim that they relied on oral promises of the Bank cannot prevail in the face of the execution of the January 12, 1978 agreement and its subsequent extensions.

Under case law in Montana, it is clear that evidence of prior oral agreements is not admissible for the purpose of altering subsequent written agreements dealing with the same subject, and that the prior oral agreements and the written agreement will merge into the subsequent written agreement unless they are distinct and can stand independently of one another. Reeves v. Reinbolt (Mont. 1980), 615 P.2d 896, 899, 37 St.Rep. 1500, 1504. We find no basis for estoppel here.

We turn now to the critical issue of fact determined by the District Court, namely, that the January 12, 1978 agreement "represents the intentions of the parties." The finding is, of course, a mixed finding of fact and conclusion of law, but that circumstance does not take away its efficacy as a finding of fact. As such, it comes to this appellate court under the shield of Rule 52(a), M.R.Civ.P. that findings of fact may not be set aside by us unless clearly erroneous. Far from being clearly erroneous, the finding is supported in the testimony of the Bank officers, and the execution of the written instruments following the oral negotiations.

Another point argued by the McGuinnesses on appeal is that the District Court led itself into error by adopting verbatim the proposed findings of the Bank. The District Court made 47 findings of fact; 38 of the findings were adopted verbatim from those proposed by the Bank. Of the remaining, 6 consist of biographical information concerning

the McGuinnesses, and 3 discuss the McGuinnesses' relationship with Bruce Dailey.

The McGuinnesses contend that by adopting verbatim the Bank's proposals, the court led itself into egregious error because it made no findings relating to the affirmative defenses and counterclaims raised by the McGuinnesses. The District Court's findings do not discuss or mention the theories of defense, or state why the theories were rejected by the District Court, with the exception of finding no. 37 which stated that the Bank "has exercised good faith and fair dealing with the defendants in the commercial transactions."

This Court has expressed its dissatisfaction, if not outright disapproval, of verbatim adoption of findings of fact proposed by one party or the other in a case tried without a jury. In Re the Marriage of Merry (1984), 689 P.2d 1250, 1254, 41 St.Rep. 2009, 2014, 2015; Eaton v. Morse (Mont. 1984), 687 P.2d 1004, 1009, 1010, 41 St.Rep. 1708, 1714, 1715; Wolfe v. Wolfe (Mont. 1983), 659 P.2d 259, 261, 262, 40 St.Rep. 211, 213, 214; Hunter v. Hunter (1982), 196 Mont. 235, 245, 246, 639 P.2d 489, 495; Tomaskie v. Tomaskie (Mont. 1981), 625 P.2d 536, 538, 539, 38 St.Rep. 416, 419.

As we have noted, the danger in verbatim adoption of proposed findings from one party is that the court does not show itself to be exercising independent judgment. When such verbatim adoption occurs, we expect the District Court to explain why the party's proposals were adopted. Nonetheless, we have said that our ultimate test for the adequacy of findings of fact is whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence presented. We have also said that the verbatim adoption of

one party's proposed findings and conclusions is not in itself an automatic basis for vacating a judgment. Wolfe, supra; Eaton, supra.

Our examination of the findings of fact made by the District Court in this case shows that the findings are sufficiently comprehensive and detailed to justify the decision of the District Court insofar as the decision went. Although the court made no specific findings on the defenses and affirmative defenses and counterclaim raised by the McGuinnesses, it is apparent that the District Court felt that this case was controlled by the fact that it found no specific agreement from the Bank, orally or in writing, not to foreclose upon the McGuinness properties, and the writings executed by the parties indicated that the annual extensions of the maturity date of the consolidated indebtedness were a matter of grace from the Bank. However, the failure of the District Court to make findings of fact that related to the affirmative defenses and counterclaims so as to negate them, if that were the decision of the District Court, is a serious defect.

When, as here, the District Court has decided the issues raised by one party, but not those raised by the other party, and has entered judgment based on the issues it has decided, the case comes to us on appeal much in the posture of a summary judgment by the court against the other party on the issues raised by the other party. We have no findings to guide us, and remand for findings would be required unless on examination of the whole record the issues raised by the other party raise no genuine issue of material fact.

In Food Fair Store, Inc. v. Square Deal Market Co. (D.C. Cir. 1953), 206 F.2d 482, 484, cert.den. (1954), 346 U.S.

- 12 -

937, 74 S.Ct. 377, 98 L.Ed. 426, the District Court's opinion contained no express findings and conclusions relating to the counterclaim. Nonetheless the Court of Appeals held the findings made were amply justified by the evidence and adequate for purposes of review.

In Graham v. United States (9th Cir. 1957), 243 F.2d 919, 923, the Court said:

> This Court cannot make findings [citing authority]. When there is a failure to make necessary findings this Court will not dismiss the appeal, but ordinarily vacates the judgment and remands the case to the district court for appropriate findings of fact. [Citing a case.] A failure to make findings does not always require remand if a complete understanding of the issues may be had without the aid of separate findings .. . .

In Yanish v. Barker (9th Cir. 1952), 232 F.2d 939, 947, we find:

> A recognized exception to the general rule requiring a case to be sent back for findings is where ". . . the record considered as a whole does not present a genuine issue as to any material fact . . ."

There is a voluminous record in this case. In addition to 338 pages of testimony, there are 46 individually marked exhibits, and the entire contents of the Bank files relating to the defendants' transactions with the plaintiff. We have determined from the record that there is no genuine issue of fact on which the District Court could have found for the McGuinnesses in support of their legal defenses against the foreclosure proceedings. There is no need to remand for further findings.

We have already discussed the elements of estoppel, and lack of consideration. The fact issues that were resolved by the District Court in its findings negate any possibility that an oral contract existed between the parties which was

not merged in the written agreements subsequently executed by them.

Perhaps the most serious of the McGuinnesses' contentions relating to their counterclaim and affirmative defenses is their contention that the Bank was guilty of bad faith in the manner of consolidating the indebtedness. The McGuinnesses contend that because they were falsely led to believe that the Bank would not foreclose on their properties, they were induced thereby to subdivide their property through a developer, Bruce Dailey, who was connected to the Bank through his uncle, Clyde Wood, who was an officer and director of the Bank.

There is little doubt that the Bank applied pressure to the McGuinnesses to subdivide and sell their lands. The Bank informed them that the alternative to subdividing was a foreclosure and forced sale of the land. Without subdividing, the indebtedness could hardly be paid off in such a forced sale. Yet, that position, taken by the Bank and outlined by the Bank to the McGuinnesses can hardly be characterized as anything but good business sense both for the Bank and for the McGuinnesses. It does not constitute bad faith.

It further appears that there was subtle pressure on the part of the Bank that the McGuinnesses employ the services of Dailey. In one letter, the bank president expressed "dissatisfaction" that McGuinnesses had not been able to consummate a deal with Dailey with a consequent delay of the sales of parcels of the land. Although Dailey obviously had a "sweetheart" connection with the Bank, nonetheless the services he rendered were in conformance with the objectives of both the McGuinnesses and the Bank in subdividing the

property and applying the proceeds of sales to the McGuinnesses indebtedness. In truth, the subdivision of the real property has resulted in a reduction of the consolidated indebtedness from $545,647.17 at the beginning, to the sum of $337,205.35, the principal indebtedness remaining due at the time of the judgment, in addition to sizeable interest payments. Although the McGuinnesses claim a loss in the value of their real property amounting to $873,064.00, their only real choices were subdivide or face foreclosure.

The McGuinnesses also contended as an affirmative defense that the officers, agents and employees of the Bank had suggested the subdivision of the lands to the McGuinnesses as an advantageous means of eliminating their obligations; that the McGuinnesses relied and were dependent upon the advice of the Bank in those matters and that thereby a fiduciary relationship arose between the Bank and the McGuinnesses. They contend that the Bank failed to exercise reasonable care in making those recommendations and that their conduct in that regard constituted gross negligence. We see nothing in the record to justify those allegations.

The negligence counterclaim of the McGuinnesses is that the Bank was negligent in the selection of Bruce Dailey and the realty company as the development realtors for the project, negligent in the supervision and control of the development and subdivision, and negligent in the management and enforcement of the contracts for sale executed in conjunction with the subdivision. Most of the facts which relate to this contention are intertwined with what we have said above, but it is clear from the record that the McGuinnesses entered of their own volition into the subdivision arrangements and the sales contracts. In fact,

the McGuinnesses stipulated that Dailey was neither an employee nor agent of the Bank. Again the negligence contention is groundless.

The final contention of the McGuinnesses is that they entered into an agreement with the Bank to finance their business, under which the Bank did begin to extend the monies that financed their business operations. Because the McGuinnesses relied on the Bank, they did not secure other financing, relying on the plaintiff's representations that such financing would be continued. They contend that in the year 1978, in breach of the oral agreement, the Bank without notice, refused to honor the agreement to finance their business operations. They blame the Bank for their inability to secure other financing and allege a loss of $1,075,730.00. On the record of this case, we find no support for such a claim.

There was also an issue of admissibility of evidence at the trial before the District Court. In the examination of Bruce Dailey, the McGuinnesses made an offer of proof which was denied by the District Court. The offer of proof was to the effect that Dailey and one Joe Rock of Missoula, if each were allowed to testify, would reveal that Rock had financial dealings with the Bank and the Farmers State Bank of Victor, Montana; that Rock had an indebtedness of $400,000.00 to the banks which was secured by a dairy farm, livestock and equipment; that Clyde Wood, as vice president of the Missoula Bank, advised Rock in 1974 that he had a buyer for some other of Rock's real property at a sales price of $300 per acre; that if he sold the land there would not be a foreclosure by the Bank on his dairy farm; that Rock sold the land to Clyde Wood's buyers who he later learned were Bruce Dailey and his

- 16 -

wife; that two tracts in the same area earlier had been sold for $1,000 per acre; that the land sold to Dailey was immediately subdivided and sold by him at a substantial profit.

On its face, the offer of proof relates to evidence that has no relevancy to the case at bar. The District Court properly refused the evidence.

Accordingly, we affirm the judgment of the District Court.

_____
              Justice

We Concur:

_____
         Chief Justice

_____

_____

_____

_____
              Justices