Glen GARRETT and Elizabeth Garrett, husband and wife; and Michael Garrett, Brad Garrett and Jeff Garrett, Plaintiffs and Appellants,

v.

BANKWEST, INC., a South Dakota corporation (formerly, BankWest, N.A.), and Jack Lynass, individually and as an officer of BankWest, Inc., Defendants and Appellees.

No. 16691.

Supreme Court of South Dakota.

Argued Jan. 8, 1990.

Decided Aug. 1, 1990.

Ronald L. Brown, Fort Collins, Colo., William E. Gast of Gast & Peters, Omaha, Neb., Laurence J. Zastrow, Pierre, for plaintiffs and appellants.

John M. Costello, William G. Porter of Costello, Porter, Hill, Heisterkamp and Bushnell, Rapid City, for defendants and appellees.

KEAN, Circuit Judge.

This appeal involves a dispute between an agricultural debtor and a creditor bank. It has its basis in the debtor's inability to satisfy a large debt load while faced with the rural economic crisis of the 1980's.

Glen and Elizabeth Garrett (Garrett) owned and operated a 5400 acre farm and cattle ranch (ranch) in Sully County, South Dakota for many years prior to 1980. The other plaintiffs who assisted in this endeavor are their sons. In 1980 a family decision was made to expand the crop growing capabilities of the ranch and an irrigation system was planned. The purpose of this project was to expand the income producing ability of the operation so it could support Garrett and their sons' families. The sons were also purchasing a parcel of land adjacent to the Garrett home ranch.

The expansion decision would require a large infusion of new capital and a significant loan was required. Garrett went to BankWest, Inc. (BankWest) to discuss the plan. Garrett and BankWest (and its predecessor BankWest, N.A.) had a debtor-creditor relationship since 1978 although the operation loans Garrett received were much less in comparison to the scope of the irrigation project.

After a review of Garrett's plan, BankWest agreed to expand the limits of the operation financing to accommodate the partial irrigation of the ranch. However, the financing of the irrigation equipment was done through an agricultural subsidiary of John Hancock Life Insurance Company (Hancock). The loan from Hancock to Garrett was over one million dollars. The irrigation equipment was installed in 1981 at which time Hancock received a first mortgage on the Garrett ranch. BankWest, for its operation financing, had security in livestock, crops and machinery.

In 1982 the rural economy in the United States began to suffer. Farm prices for livestock and crops fell. Land values declined from record highs, inhibiting borrowing power. Garrett was not exempt from

these financial deficiencies and began to experience significant cash problems. The immediate impact was his inability to meet the payment requirement on the Hancock loan.

The economic situation did not improve in 1983. In this year Garrett had problems, not only with the Hancock loan, but also with the operating loan at BankWest. On November 10, 1983, BankWest renewed Garrett's operating loan which had by then swollen to $1,085,000.00. BankWest took a second mortgage on the real estate as further security. This renewed loan was written as two separate "lines of credit," one for $300,000.00 and the other for $785,-000.00. As part of this loan arrangement, Garrett signed a "Memorandum of Understanding and Loan Covenants" (memorandum) which required Garrett to adhere to a cash flow statement submitted and accepted by BankWest. Any deviation from the cash flow statement required BankWest's approval. The cash flow statement was prepared from anticipated revenue data that Garrett provided.

According to the memorandum, Garrett would repay the $300,000.00 line of credit by April 1, 1984 from a series of specified sales of grain and livestock. The other loan of $785,000.00 was to be reviewed on April 1, 1984. This loan was due November 1, 1984. The memorandum required BankWest's approval of any capital expenditures and instructed Garrett to pursue the sale of real estate to reduce the debt load.

The rural economy had not improved by early 1984 and the cash flow from the specified sales was significantly less than what had been projected in the memorandum. Further, other income was down and operation expenses were up. Garrett was unable to make the first 1984 loan payment to Hancock due May 1, 1984. When asked, BankWest refused to loan Garrett the money for the loan payment because it did not want to loan money to pay off a debt.

While the parties agree that BankWest refused to loan Garrett the money for the Hancock payment, there is a dispute whether Jack Lynass (Lynass) offered to ask Hancock to delay the payment. Regardless of the dispute, Hancock accelerated the loan and began foreclosure proceedings against the Garrett ranch.

After the foreclosure began, BankWest and Garrett met several times and discussed options to stave off the foreclosure. Eventually BankWest offered to buy out Hancock's loan at a figure $200,000.00 less than the principal and interest due. Hancock rejected the offer. Garrett also claims, however, that BankWest, through Lynass, contracted with him to buy out Hancock and then lease the ranch back to Garrett with an option to buy. BankWest claims that this arrangement was only discussed as an option provided it could be done at a value which would allow BankWest to protect its interests.

Hancock proceeded with its foreclosure action after it rejected BankWest's offer. With no chance to save the ranch, Garrett and BankWest, after the redemption period, entered into a liquidation agreement under which Garrett turned over his remaining property to BankWest to settle his outstanding indebtedness.

Garrett and his family then brought this action asserting a very wide variety of legal theories. Extensive discovery was completed.[1] BankWest and Lynass then moved for summary judgment on all counts directed against each of them individually and jointly. The trial court granted summary judgment and Garrett appealed.

## SUMMARY JUDGMENT

The standard of review of a grant or denial of summary judgment was recently summarized in *Pickering v. Pickering*, 434 N.W.2d 758, 760–61 (S.D.1989):

> In reviewing a grant or a denial of summary judgment under SDCL 15–6–56(c), we must determine whether the moving party demonstrated the absence of any

1. The Garrett brief recites that summary judgment was granted long before discovery was completed. The size of the record contradicts this claim. Nearly 1000 pages of depositions were submitted for appeal together with 183 exhibits plus other discovery documents.

genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. *Groseth Intern., Inc. v. Tenneco, Inc.*, 410 N.W.2d 159, 164 (S.D.1987). The evidence must be viewed most favorably to the non-moving party and reasonable doubts should be resolved against the moving party. *Wilson v. Great Northern Ry. Co.*, 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968). The non-moving party, however, must present specific facts showing that a genuine, material issue for trial exists. *Ruane v. Murray*, 380 N.W.2d 362, 364 (S.D.1986). Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper. *Weatherwax v. Hiland Potato Chip Co.*, 372 N.W.2d 118, 120 (S.D.1985); *Ruple v. Weinaug*, 328 N.W.2d 857, 859–60 (S.D.1983).

## ISSUES

Garrett originally raised ten legal issues. At oral argument two of these issues were abandoned.[2] The remaining issues can be combined and reduced to five:

1) Did a fiduciary relationship exist between BankWest and Garrett; if so, was this fiduciary relationship breached by BankWest?

2) Was there sufficient evidence of a contract between Garrett and BankWest to purchase or redeem the Garrett property from Hancock and lease it back to the Garretts?

3) Does South Dakota recognize the tort of a breach of a "duty to deal honestly, fairly and in good faith"; if so, did BankWest and Lynass breach this duty?

4) Do the facts support the use of the doctrine of promissory estoppel to preclude BankWest from denying the existence of a contract to purchase and redeem then lease the property back to the Garretts?

5) Is there any evidence of fraud and deceit on BankWest's part regarding the alleged promise to buy out the Hancock loan?

## FIDUCIARY DUTY

Garrett asserts that BankWest and Garrett had a fiduciary relationship which BankWest breached in an effort to improve its economic position without consideration of the effect its actions might have on Garrett.

■ This court has not addressed the issue of when a bank owes a fiduciary duty to a borrower. Many other courts have addressed this issue, however, and can be looked to for guidance. The Supreme Court of Kansas, in *Denison State Bank v. Madeira*, 230 Kan. 684, 230 Kan. 815, 640 P.2d 1235, 1241 (1982), a case involving an experienced businessman who established a line of credit at the bank when he bought a car dealership, described a fiduciary relationship:

> A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* A fiduciary is a person with a duty to *act primarily for the benefit of another.* A fiduciary is in a position to have and exercise, and does *have and exercise influence over another.* A fiduciary relationship implies a condition of *superiority of one of the parties over the other.* Generally, in a fiduciary relationship, the property, interest or authority of the other is *placed*

**2.** Garrett abandoned a third party beneficiary claim and an economic coercion claim. By abandoning the third party beneficiary claim (the theory being that the sons were potential heirs of Garrett and thus beneficiaries under the contracts with BankWest), the sons' interest in the appeal completely vanished since they were not involved on the contracts or notes with BankWest.

The final issue, interference with contractual relations, has no basis in fact. Garrett's argument centers around conduct between BankWest and Hancock involving alleged contracts. As the text of the decision notes, no such contracts exist. Moreover, Garrett failed to list this issue in the docketing statement as required by SDCL 15–26A–4(4).

*in the charge of the fiduciary.* (emphasis original). (citations omitted).

\* \* \* \* \* \*

In an old Indiana Appellate Court case, we find some definitive elements which may be relevant in determining whether a fiduciary relationship exists.

'There is no invariable rule which determines the existence of a fiduciary relationship, but it is manifest in all the decisions that there must be not only confidence of the one in the other, but there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, *giving to one advantage over the other.' Yuster v. Keefe*, 46 Ind.App. 460, 466, 90 N.E. 920 (1910). (emphasis original).

The Supreme Court of North Dakota recently addressed the issue of the fiduciary duty of a bank to its customers:

In a commercial context, the mere rendering of advice by the lender to the borrower, even if given in a sincere effort to help the borrower prosper, does not transform a business relationship into a fiduciary relationship.... Rather, actual day-to-day involvement in management and operations of the borrower or the ability to compel the borrower to engage in unusual transactions is required for the purposes of showing that a lending institution had 'control' over a borrower. (citations omitted).

*Union State Bank v. Woell*, 434 N.W.2d 712, 721 (N.D.1989). Earlier in this decision, the North Dakota court held that the relationship between a bank and its customer is normally viewed as a debtor-creditor relationship which imposes no special or fiduciary duties upon the bank.[3] Such a relationship can become a fiduciary relationship if the borrower reposes a faith, confidence and trust in the bank which results in dominion, control or influence over the borrower's affairs. Finally, the borrower who reposes the confidence must be in a position of "inequality, dependence, weakness or lack of knowledge." *Id.* at 721. *See also, Stenberg v. Northwestern Nat'l Bank of Rochester*, 307 Minn. 487, 238 N.W.2d 218 (1976).

Garrett alleges that BankWest acted as friend, confidante, and financial advisor during 1980–1986. Garrett further alleges that BankWest's actions during this period resulted in BankWest taking over complete control of the financial operations of the Garrett ranch. More specifically, Garrett claims the farm and ranch operation was financially controlled by BankWest via the 1983 "Memorandum of Understanding and Loan Covenants."

The record from the depositions prior to mid–1983 indicates that Garrett was an experienced businessman-rancher-farmer who acquired a college degree in agriculture in 1958 from South Dakota State University with a minor in agricultural economics. Garrett stated that he was competent to run his own business; that BankWest never attempted to physically operate his ranch; that he understood he was in a debtor-creditor relationship with BankWest; and, that BankWest had no control over the day-to-day functioning of the farm-ranch. Garrett "cannot now claim a better version of the facts than his own testimony." *Klatt v. Continental Ins. Co.*, 409 N.W.2d 366, 370 (S.D.1987). The question becomes, then, whether any facts developed after 1983 which changed this debtor-creditor relationship.

█ The claim of a fiduciary relationship hinges upon whether the 1983 memorandum and cash flow statement gave BankWest the type of control over Garrett that is sufficient to establish a fiduciary relationship.

The memorandum and the cash flow statement represent a negotiated agreement between BankWest and Garrett about

---

**3.** In the context of the relationship between a depositor and a bank, the South Dakota Supreme Court has consistently held that, in the absence of a special arrangement, the relationship between the two is that of a creditor and debtor and nothing more. *Flaherty Brothers v. Bank of Kimball*, 75 S.D. 468, 68 N.W.2d 105 (1955) and *Haman v. First National Bank in Sioux Falls*, 79 S.D. 565, 115 N.W.2d 883 (1962).

how to repay the $1,085,000.00 loan. Garrett was involved in creating the cash flow projections with BankWest. Two cash flow statements were prepared based upon information supplied by Garrett and data from BankWest. Garrett was never required to agree to either, but accepted the second because it gave him more money for living expenses. Garrett agreed to the conditions BankWest required in order to obtain the loan renewal, but he understood he could have refused and declined BankWest's offer.

The post mid–1983 record indicates that BankWest had an interest in Garrett's ranch only as a secured lender. No other interest of BankWest is asserted by Garrett. BankWest had a right to expect payment on its loan and to require Garrett to maintain an adequate accounting of the ranch operations. *See NCNB Nat. Bank of North Carolina v. Tiller*, 814 F.2d 931, 936 (4th Cir.1987) (monitoring and protection of collateral are "normal incidents of a borrower-lender relationship" and do not amount to control); *In Re W.T. Grant Co.*, 699 F.2d 599, 610–11 (2d Cir.1983) (creditor's monitoring of operations and proffering management advice, without more, does not constitute control); *Cooper v. Union Bank*, 527 F.2d 762, 765 (9th Cir.1975) (provisions in loan agreement giving bank right to accelerate debt if debtor fails to remit monthly activity reports is not control); *Krivo Industrial Sup. Co. v. National Distill. & Chem. Corp.*, 483 F.2d 1098, 1104 (5th Cir.1973).

Garrett's property was not placed in the charge of BankWest. BankWest did not have an advantage over Garrett by way of business intelligence, knowledge of the facts involved, or mental strength. BankWest was not in charge of day-to-day management and operations of the Garrett ranch. Under the general principles of fiduciary relationships, *supra*, BankWest was not in a fiduciary relationship with Garrett and, therefore, owed no fiduciary duties to Garrett.

■ The existence of a duty and the scope of that duty are questions of law for a court to decide. *Lalley v. Safway Steel Scaffolds, Inc.*, 364 N.W.2d 139 (S.D.1985); *Erickson v. Lavielle*, 368 N.W.2d 624 (S.D. 1985). This issue was therefore appropriate for decision on a summary judgment motion. The trial court is affirmed on its grant of summary judgment for BankWest and Lynass on the fiduciary duty claim.

### BREACH OF CONTRACT TO REDEEM/LEASE BACK

Garrett claims that there was sufficient evidence in the record to show the existence of a contract between BankWest and Garrett to purchase and redeem the Garrett real estate from Hancock and lease it back to Garrett. We disagree.

■ This court has held that an oral agreement for a lease must be clear and definite as to its terms. *Engle v. Heier*, 84 S.D. 535, 173 N.W.2d 454 (1970). In *Engle*, the plaintiff sued for damages based on failure to perform an alleged oral agreement for a lease. We upheld summary judgment for the defendant, based on the lack of record evidence that the terms of the oral agreement were ever settled and agreed upon:

> To be binding, an agreement for a lease must be certain as to the terms of the future lease. If it appears that any of the terms of the future lease are left open to be settled by future negotiation between the lessor and lessee 'There is not complete agreement; the minds of the parties have not fully met; and until they have, no court will undertake to give effect to those stipulations that have been settled, or to make an agreement for the parties respecting those matters that have been left unsettled.' (citations omitted).

173 N.W.2d at 456.[4]

---

4. *Hunt v. McIlroy Bank and Trust,* 2 Ark.App. 87, 616 S.W.2d 759 (1981), held, in a similar case, that the parties must make the contract, not the court. Courts can only construe and enforce a contract. When the terms are vague, there is no meeting of minds and, thus, no contract. *See,* in addition, *Union State Bank v. Woell, supra,* 434 N.W.2d at 717–718, and *Deadwood Lodge No. 508 v. Albert,* 319 N.W.2d 823, 826 (S.D.1982) ("An agreement must be suffi-

In his deposition [5] Garrett admitted that some of the terms of the alleged lease agreement were never discussed. Garrett also admitted that the lease was intended to be put in writing and signed by both parties at a later time.[6] In addition, Garrett's son (Brad) admitted that the terms of the purchase of the Garrett ranch by BankWest were never discussed. Specifically, Brad stated that the date of purchase and the purchase price were never stated. Therefore, the date the alleged lease was to begin was also an unsettled term.

The record clearly indicates that there was never a complete agreement between Garrett and BankWest concerning the purchase and lease-back. This fact warrants affirmance of the trial court's grant of summary judgment for BankWest on the "breach of contract to redeem" claim.

■ Summary judgment on the breach of contract to redeem claim can also be affirmed on the ground that Garrett gave no consideration for this agreement. SDCL 53-1-2 provides that "sufficient cause or consideration" is an essential element of a contract. SDCL 53-6-1 provides:

Any benefit conferred or agreed to be conferred upon the promiser [sic] by any other person to which the promiser [sic] is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer as an inducement to the promiser [sic], is a good consideration for a promise.

Garrett argues that the consideration for the agreement to redeem from Hancock was that BankWest would then own the property. BankWest would also continue to have its debt reduced by Garrett's sale of some of the assets and would receive rental income during the lease period. In addition, BankWest would be able to maintain its relationship with Garrett.

■ The fact that BankWest would own the Garrett ranch, if it was redeemed from Hancock, has no relevance to the issue of whether Garrett gave consideration for the alleged contract to redeem and lease-back. Garrett's second argument, that BankWest would have its debt reduced, also fails. The reduction of debt that Garrett owed

---

ciently definite to enable a court to give it exact meaning.")

5. Q Okay. And your understanding of that agreement, as you call it, was that, of course, there would be certain details that would have to be handled as far as the agreement is concerned, such as who would pay the utilities on the property, who would—just what the specific optional agreement would be, correct;
Was there any agreement as to that?
A No.
Q That was to be decided upon, when, later, after the—
A It wasn't talked about, that part.
Q Wasn't talked about?
A No.
Q Okay. And what was the term—what was the rental that you would be paying under the lease?
A The rental would be the amount of the John Hancock buy-out, the remaining balance of the loan, those two items tied together, and the rate would be determined by a one year T-Bill rate.
Q Okay. But the rest of these things that we've talked about, the optional things had yet to be decided and once decided they would be a part of the agreement, correct?
A I would assume that would be correct.

Q Yeah. And ultimately all this would be put down on paper and signed by you and signed by the bank, correct?
A Right.
Q That never got done?
A That never got done.
Q Those optional matters never got agreed to?
A That's correct.
(G. Garrett Depo. at 485–486)

6. Although not argued by either party, a distinction does exist between a present lease, which creates an interest in land, and a mere agreement for lease. See, Shaw v. George, 82 S.D. 62, 141 N.W.2d 405 (1966).

In his deposition Garrett testified about a five to nine year lease. Thus, SDCL 53-8-2(3), which requires leases in excess of one year to be in writing, must be considered. Garrett argues there was partial performance which would remove the "contract" from the restraints of this statute. Even assuming, however, that Garrett did perform some act, there is still no method to determine what the terms of the contract were even if parol evidence was used. As noted in fn. 4, supra, there must be some definite terms for the court to determine what was agreed to. Garrett's deposition reveals that the terms were vague, nonexistent, never discussed, or deferred to the future.

BankWest cannot be labeled consideration since Garrett was already under a legal duty to pay BankWest what was owed to it. Payment of an existing obligation, which confers no additional benefits to the promisor or detriment to the promisee, is not good consideration. *Dawson v. Corbett*, 71 S.D. 106, 21 N.W.2d 758 (S.D.1946).

## BREACH OF DUTY TO ACT IN GOOD FAITH

Garrett claims that the trial court erred in granting a summary judgment for BankWest and Lynass on the issue of a breach of an implied duty to act in good faith "and to refrain from doing anything that will injure the rights of the other party to receive the benefits of their agreement." This claim is made under both a common law duty and an obligation imposed by statute. Garrett further alleges that BankWest and Lynass have, apart from the contract, an implied duty of good faith and fair dealing, and breach of this duty gives rise to an independent cause of action in tort.

■ Every contract contains an implied covenant of good faith and fair dealing which prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract. *Restatement (Second) of Contracts*, § 205 (1981).[7] 3 A. Corbin, *Contracts* § 541, at 97 (1960); 5 S. Williston, *A Treatise on the Law of Contracts* § 670, at 159 (3rd Ed.1961). A majority of American jurisdictions recognize a duty to perform a contract in good faith. *See* Burton, *Breach of Contract And the Common Law Duty to Perform in Good Faith*, 94 Harvard L.Rev. 369 (1980). The concept is written into the Uniform Commercial Code

(U.C.C.) § 1–203 which is set forth in SDCL 57A–1–203:

> Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement.

"Good faith" is defined as "honesty in fact in the conduct or transaction concerned." SDCL 57A–1–201(19).

The application of this implied covenant allows an aggrieved party to sue for breach of contract when the other contracting party, by his lack of good faith, limited or completely prevented the aggrieved party from receiving the expected benefits of the bargain. A breach of contract claim is allowed even though the conduct failed to violate any of the express terms of the contract agreed to by the parties. Summers, *"Good Faith" In General Contract Law and the Sales Provisions of the Uniform Commercial Code*, 54 Va.L.Rev. 195 (1968); Burton, *Breach of Contract And the Common Law Duty To Perform In Good Faith, supra; e.g., Shaw v. E.I. DuPont de Nemours and Company*, 126 Vt. 206, 226 A.2d 903 (1967).

■ Good faith is derived from the transaction and conduct of the parties. Its meaning varies with the context and emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party. *Restatement (Second) of Contracts, supra*, Comment a. But good faith is not a limitless duty or obligation. The implied obligation "must arise from the language used or it must be indispensable to effectuate the intention of the parties." *Sessions, Inc. v. Morton*, 491 F.2d 854, 857 (9th Cir.1974). Before applying a duty to act in good faith in contractual matters to the facts of this case, we must first address Garrett's claim

---

**7.** Sec. 205 DUTY OF GOOD FAITH AND FAIR DEALING

> Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

Prior to this decision, contractual good faith has been limited in South Dakota and applied only to contracts where a specific quantity is ordered. "[T]he courts will protect the aggrieved party from unfair usage by applying a test of good faith to the other party's actions." *Teigen*

*Construction, Inc. v. Pavement Specialists, Inc.*, 267 N.W.2d 574, 578 (S.D.1978). Requests to rule upon good faith in commercial loan transactions have been deferred. *See, First Bank of South Dakota v. Voneye*, 425 N.W.2d 630, 634 fn. 4 (S.D.1988). *C.f., Olson v. Tri–County State Bank*, 456 N.W.2d 132 (S.D.1990) (a bank is not liable for bad faith refusal to extend credit to the maker of a note when the unpaid balance of loans to maker already exceeded the bank's lending limits).

that a separate tort for breach of good faith should be recognized.

## A. THE TORT OF BREACH OF GOOD FAITH

An implied covenant of good faith was initially strictly confined to the sphere of contract law. The strict contract approach was somewhat eroded over thirty years ago when, in *Comunale v. Traders & General Insurance Company*, 50 Cal.2d 654, 328 P.2d 198 (1958), the California Supreme Court recognized that breach of an implied covenant of good faith and fair dealing in insurance contracts would constitute a separate and distinct tort. This tort concept, in the context of bad faith insurance settlement, has been recognized in most states. *See*, Kornblum, *Recent Cases Interpreting the Implied Covenant of Good Faith and Fair Dealings*, 30 Def. L.J. 411 (1981); *Crabb v. National Indemnity Co.*, 87 S.D. 222, 205 N.W.2d 633, 63 A.L.R.3rd 715 (1973).

An attempt to develop a distinctively new tort doctrine independent of a contract has had little success, however. For example, employees who lost their jobs because they were at-will employees and who could not sue for breach of contract, sought to establish a remedy for breach of good faith and fair dealings. Most courts have rejected this offer to develop a new tort action. South Dakota has specifically rejected the "transplantation of the covenant of good faith and fair dealings into the foreign soil of the employment-at-will doctrine." *Breen v. Dakota Gear & Joint Co., Inc.*, 433 N.W.2d 221, 224 (S.D.1988); *Blote v. First Federal Savings & Loan Ass'n*, 422 N.W.2d 834 (S.D.1988); *French v. Dell Rapids Community Hosp., Inc.*, 432 N.W.2d 285 (S.D.1988).

We decline the Garrett request to create an independent tort of breach of good faith independent of contract or duty arising under contract. We do so for several reasons.

Garrett has cited no authority for this position. The case Garrett cites, *Yankton Prod. Credit Ass'n v. Jensen*, 416 N.W.2d 860 (S.D.1987), does not support this claim.

The use of the language "bad faith" in this case did not refer to lack of "good faith," but rather referred to ill-will or malice upon which a claim for punitive damages might be founded. This distinction is noted in *Neal v. Farmers Ins. Exchange*, 21 Cal.3rd 910, 148 Cal.Rptr. 389, 582 P.2d 980 (1978). The failure to cite authority waives the issue on appeal. *Kanaly v. State by and Through Janklow*, 403 N.W.2d 33 (S.D.1987); *Kostel Funeral Home, Inc., v. Duke Tufty Co.*, 393 N.W.2d 449 (S.D. 1986); SDCL 15–26A–60(6).

Moreover, the authority found in both contract law and the U.C.C. is contrary to Garrett's position. The few cases in which this argument has been raised in the context of the U.C.C. have required a contract or duty to exist prior to the application of any principles of good faith. In *State Bank of Hartland v. Arndt*, 129 Wis.2d 411, 385 N.W.2d 219, 223 (Ct.App.1986), the Wisconsin court addressed the issue of good faith:

> The duty of good faith does not by itself require a secured creditor to file a continuation statement. *Good faith cannot stand alone. The obligation of good faith must attach to some other conduct.* Because chs. 401 to 409, Stats., impose no duty upon the bank to file a continuation statement, Arndts have failed to establish statutorily required conduct to which a good faith obligation will attach. (emphasis added). (citations omitted).

In *Union State Bank v. Woell, supra*, a debtor counterclaimed against a bank which was suing for a debt based upon a note. The debtor asserted that he had been promised long term financing by the bank. When the business climate turned downward, the bank and debtor entered into a "memorandum agreement" which provided for a new note, a personal guarantee and payment by a specific date. If payment was not made, an auction would occur to reduce the debt. An auction did occur and the proceeds were made payable to the bank and debtor jointly. The bank sued to recover the proceeds, and the debtor counterclaimed raising nearly the same

issues as Garrett has in this case: fraud, breach of fiduciary duty, the tort of bad faith. In deciding for the bank, the North Dakota court wrote:

> We have not ruled whether a tort action exists in this jurisdiction for breach of the obligation of good faith in a commercial context, and decline to do so today, because even if we were to recognize such a tort, summary judgment against Woell on this claim would nevertheless have been proper.
>
> \*   \*   \*   \*   \*   \*
>
> The obligation to exercise good faith extends to "[e]very contract or duty" within the Uniform Commercial Code. *Thus, in order for the good faith requirement of § 41–01–13 to apply, a contract or duty owing under the U.C.C., to which the good faith obligation can attach, must first be established.* (emphasis added).

At 715–716. *See also Brown v. Indiana Nat. Bank,* 476 N.E.2d 888 (Ind.App. 4 Dist.1985).

■ Apart from the U.C.C., in contract law before a party can sue for breach of good faith, a contract must be proven. Contract law does not recognize a breach of good faith separate from a contract. A review of the cases cited in Burton, *Breach of Contract and The Common Law Duty To Perform In Good Faith, supra,* fails to find any decision where breach of good faith in common law was not predicated upon an existing contract. Indeed, the commentator carefully avoids confusing concepts similar to breach of contract with breach of good faith implied in a contract. Thus, even in the context of traditional contract law, the failure to prove an existing contract is fatal to any claim for breach of a good faith obligation to perform a contract.

Another reason for declining to adopt a new cause of action in tort is because there is no necessity for doing so since Garrett failed to present this court with reasons why such a tort should exist. The contrac-

tual and tort remedies which now exist in South Dakota, whether by statute or case law, are adequate to protect a person's right for proven damages. As an illustration, for the breach of an obligation arising from contract, the measure of damages is the amount which will compensate the injured party "for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." SDCL 21–2–1. Thus, if Garretts could establish a contract and its breach, they would be entitled to prove damages.

Further, causes of action exist in tort in South Dakota for fraud and misrepresentation, *Littau v. Midwest Commodities, Inc.,* 316 N.W.2d 639 (S.D.1982); negligent misrepresentation, *Peterson v. Rogers,* 347 N.W.2d 580 (S.D.1984); negligence and breach of duty of common law or by statute, *Stevens v. Wood Sawmill, Inc.,* 426 N.W.2d 13 (S.D.1988); intentional infliction of emotional distress, *Groseth Intern., Inc. v. Tenneco, Inc.,* 410 N.W.2d 159 (S.D. 1987); and, intentional torts, *VerBouwens v. Hamm Wood Products,* 334 N.W.2d 874 (S.D.1983). This listing of causes of action which exist based upon tort is not exhaustive. It does, however, give an indication of the breadth of remedies available to a litigant in this state which are not dependent upon contract or the proof of a fiduciary relationship. We are of the opinion that the existing remedies are adequate to protect a commercial debtor's rights.[8]

### B. BREACH OF CONTRACTUAL GOOD FAITH OR GOOD FAITH UNDER THE U.C.C.

■ We now consider whether there has been a breach of good faith either under contractual obligations or the U.C.C. There can be no breach of an implied covenant of good faith as it applies to either the "contract" to contact Hancock or the "contract" to redeem the ranch and lease it back to the Garretts. In both instances it has been previously determined that nei-

---

**8.** Another writing arguing for a limitation upon any new tort is Diamond, *The Tort of Bad Faith Breach of Contract: When, If At All, Should It Be* *Extended Beyond Insurance Transactions,* 64 Marquette L.Rev. 425 (Spring 1981).

ther contract existed. There is no contract to which the "good faith" required by *Restatement (Second) of Contracts,* § 205, can attach if these contracts are governed by common law principles. If principles of the U.C.C. are used, the same result is compelled because SDCL 57A–1–203 requires a contract or duty. *See, Union State Bank v. Woell, supra.* Thus, regardless of the theory proposed by Garrett, the breach of good faith claim cannot survive since it involves these claimed contracts. We now turn to the 1983 renewal loans.

■ Although Garrett's allegation of breach of good faith on the 1983 loans is somewhat vague, it appears centered upon BankWest's failure to continue the line of credit and refusal to loan additional funds to pay the semi-annual installment due Hancock. Garrett argues that this failure to loan the money caused the default which led Hancock to accelerate the note and commence foreclosure. Causally this is correct; but, this causation does not give rise to breach of good faith under the facts.

On November 9, 1983, Garrett asked BankWest to renew his loan. The current balance was $946,550.00 plus accumulated interest of $137,492.00. Garrett suggested that the loan be repaid in 1984 with $300,000.00 due April 1, 1984 and the balance due on November 1, 1984. A memorandum of understanding was negotiated and signed. The significant portions of that memorandum are:

### MEMORANDUM OF UNDERSTANDING AND LOAN COVENANTS

This document will serve as, and is hereby mutually agreed to, as the Loan Covenants under which BankWest, N.A. and Glen E. Garrett and Elizabeth J. Garrett, will enter into a loan.

1. The *loan amount* shall not at any time exceed $1,085,000 during the term....

\* \* \* \* \* \*

3. The Lines of Credit established shall be *re-paid* in the following manner:
   a. *$300,000 due April 1, 1984:*

1. 11/30/83—Grain Storage from Oahe Grain Company     $ 8,000
2. 12/31/83—5,000 bu oats at $1.50     7,500
3. 12/31/83—6,000 bu milo at $2.30     13,800
4. 12/31/83—50 cull cows at $350     17,500
5. 01/30/84—65,000 bu corn at $3.00     195,000
6. 01/30/84—ASCS Grain Storage Payment     10,000
7. 02/28/84—280 head of calves 600# at .60 = $3601     100,800

b. The above mentioned sales will be first turned into BankWest and any excess funds will be advanced back to Glen E. Garrett and/or Elizabeth J. Garrett for operating monies, however, the amounts advanced back shall not exceed those expenses so stated within the Cash Flow as accepted and mutually agreed to between the two parties.

c. *$785,000 Line of Credit shall be written "On Demand" and will be reviewed on April 1, 1984.*

\* \* \* \* \* \*

5. Glen E. Garrett and Elizabeth J. Garrett shall actively pursue the sale of real estate in an effort to reduce their total debt loan, with any equities realized to be paid to BankWest on their Line of Credit notes.

6. In consideration for the above Loan Covenants, *BankWest will renew their existing loans under the terms and conditions* as set forth in this Memorandum of Understanding and Loan Covenants.

7. *This Memorandum of Understanding* and Loan Covenants *shall not impair the rights or remedies available to BankWest* under the laws of the State of South Dakota or *in any way further restrict* BankWest from "Calling" the loan due and payable should for any reason Glen E. Garrett and/or Elizabeth J. Garrett break any of the above Loan Covenants or any and all portions of subsequent Security Agreements or Loan Agreements.

/s/ Glen E. Garrett
Glen E. Garrett

/s/ Elizabeth J. Garrett
Elizabeth J. Garrett
/s/ Rasmussen
Its Ag Loan Officer
(emphasis supplied).

A second document, a cash flow statement, was prepared from information Garrett provided about his expected income and disbursements from November 1983 to October 1984. Listed within this cash flow statement is: L–T–D $71,280.00 (May 1984) and $69,795.00 (Oct. 1984) [a reference to the Hancock loan].

When April 1, 1984 came, Garrett had reduced the $300,000.00 payment by $173,-749.00 derived from selling 59,300 bushels of corn. He received another payment of $6,839.00 for grain storage payments, but BankWest returned this amount to him for operating expenses. When Garrett asked BankWest for operating funds to pay the May 1, 1984, loan payment to Hancock, BankWest declined, realizing that this might trigger a default.

On June 1, 1984, Garrett presented BankWest with operating bills totaling $95,214.00 covering planting costs, seed, fertilizer and insurance. BankWest paid these bills and advanced Garrett $1,800.00 for living expenses. In return BankWest received $18,168.00 from the sale of fifty head of cows. The balance of the loans had increased back to $939,950.00.

Garrett claims that further evidence of lack of good faith occurred when Lynass unsuccessfully tried to get Hancock to extend the note, and, when BankWest failed to redeem the farm at the foreclosure and lease it back.

Good faith means "honesty in fact in the conduct or transaction concerned." SDCL 57A–1–201(19). Although written in the context of general contract law and Article 2 of the U.C.C., a definition which adequately sets forth good faith so far as it should be defined is:

> [G]ood faith is an 'excluder.' It is a phrase without general meaning (or meanings) of its own and serves to exclude a wide range of heterogeneous forms of bad faith. In a particular context the phrase takes on specific meaning, but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out.

Summers, *Good Faith in General Contract Law and the Sales Provision of the Uniform Commercial Code*, 54 Va.L.Rev. 195, 201 (1968). Professor Summers suggests some categories to identify bad faith in performance of a contract including: evasion of the spirit of the deal; abuse of power to determine compliance; and, interference with or failure to cooperate in the other party's performance. *Id. Restatement (Second) of Contracts, supra,* Comment e. And, as noted in *Sessions, Inc. v. Morton, supra,* the good faith must arise from the language used or be indispensable to effectuate the intention of the parties.

When Garrett and BankWest met in November 1983 to discuss the financial plight, Garrett owed BankWest in excess of one million dollars. The so-called line of credit was not for an additional one million dollars. The memorandum and other documents mutually agreed to by the parties attest to this conclusion and set forth a definitive method to liquidate the first $300,000.00 and the date by which the remaining balance was due. Garrett argues that the line of credit was ongoing and that once he paid down part of the loan, he was entitled to go back and request funds back up to the limit of $1,085,000.00. Such an agreement ignores the plain language of the memorandum. The agreement of the parties was to reduce the huge debt at BankWest, not to provide a continuous source of funds. Clearly the use of words such as "3(c) $785,000.00 Line of Credit shall be written 'On Demand' ...," "BankWest will renew their existing loans ...," and a clause not restricting "BankWest from 'Calling' the loan due" show this was a renewal loan, not the commencement of a new line of credit that Garrett could tap whenever he had the need.

Garrett contends the cash flow sheet indicates that BankWest committed itself to loan funds to pay Hancock. This argument fails for several reasons. The cash flow was an annual projection of income and disbursements. It was a business plan and

a sales projection much like that in *Aberdeen Prod. Credit v. Redfield Livestock,* 379 N.W.2d 829 (S.D.1985), not an agreement to loan new money. It was part of the overall agreement as to how money would be used when sales were made, provided the income was generated. Moreover, the cash flow document indicates that all income to operate the ranch was to be derived from crops, livestock, government payments and sale of capital items. There is no mention of any income from BankWest's line of credit or loans. Garrett's argument about BankWest's commitment to loan funds for the Hancock payment does not follow when all the documents are read together.

We conclude that there was no breach of good faith on the part of BankWest or Lynass. The refusal to loan the May 1984 payment to Hancock was not a breach of the loan agreement. More importantly, the refusal did not violate the spirit of the contract or the justified expectations of the parties. Garrett received the loan when the renewal occurred. An anticipation of more funds for Hancock was not within either the expectations or contemplation of the parties. Nor did BankWest or Lynass abuse their power to determine compliance. In April 1984 Garretts were in technical default on the $300,000.00 payment. A demand of all sums due at that time could have been made but was delayed. During this time BankWest attempted to prevent foreclosure, but Hancock refused the offer. In early 1985 BankWest tried to redeem, but the offer was again refused.

The most telling aspect of the lack of bad faith by BankWest is simply stated: BankWest never sued Garrett on the consolidation loan. Nor did BankWest ever interfere with Garrett's operation of the ranch thereby preventing him from attempting to raise the needed funds by farming and ranching. Instead, Garrett and BankWest, both realizing that the situation was futile, eventually entered into a liquidation agreement in March, 1986 where Garrett transferred machinery and certain parcels of land (subject to existing claims and contracts) to BankWest. In return BankWest paid Garrett $5,000.00. The liquidation agreement noted two key items:

1. The Debtors (Garrett) are currently in default on their obligations under the notes and other debt instruments in favor of BankWest; and

2. The parties mutually desire to avoid further litigation and costs of foreclosure against the secured property.

BankWest itself absorbed a loss of $685,-000.00 by entering into the liquidation agreement.

These facts demonstrate that neither BankWest nor Lynass abused their power to determine compliance nor did they fail to cooperate in Garrett's performance. The facts demonstrate that BankWest continued to work with Garrett even after default. No lawsuit was brought. BankWest absorbed a large loss and did not seek personal liability from Garrett. Of such facts bad faith is not made.

Garrett cites *K.M.C. Co., Inc. v. Irving Trust Co.,* 757 F.2d 752 (6th Cir.1985) to support his claim that bad faith existed.[9] In this case Irving Trust extended K.M.C. $3.5 million in credit. All of K.M.C.'s receipts went into an account controlled by Irving Trust. K.M.C. relied upon the line of credit for its operation since it could not secure other financing on short notice. Without any notice Irving Trust refused to advance any money on the line of credit or to release the account funds. The court held that notice of cutting off the line of credit was a prerequisite to execution of the contract. The failure of Irving Trust to give notice left K.M.C. at its mercy and was a breach of good faith even though

9. This case and similar decisions are found in Annotation, *Bank's Liability for Breach of Implied Contract of Good Faith and Fair Dealing,* 55 A.L.R. 4th 1026 (1987). The general rule of law is that a bank is required to adhere to an implied duty of good faith and fair dealing toward its customers. Both U.C.C. cases and non-U.C.C. cases are included. In one cited decision, *First Nat. Mont. Bank of Missoula v. McGuiness,* 217 Mont. 409, 705 P.2d 579 (1985) it was held that the bank applying pressure upon a bank debtor to sell and liquidate property, in contrast to a forced sale, was not conduct which could be characterized as bad faith, but was only sound business sense for both the debtor and creditor.

Irving Trust had not breached any specific provisions of the contract.

The *Irving Trust* case is distinguishable. At the time Garretts were asking for funds to pay Hancock, Garretts had used the maximum loan amount. The request was made after April 1, 1983 the due date of the $300,000.00, at a time Garrett was in default on the first major portion of the loan. Garrett knew the loan was in default. Contrast these facts with the *Irving Trust* case where no breach existed when the line of credit was terminated, nor was the maximum credit used. This court should not require a bank to totally disregard its own interests and compel it to place itself in a worse position when neither the contract nor the requirement of good faith demand such action. *See, First Bank of South Dakota v. Voneye*, 425 N.W.2d 630 (S.D.1988).

This issue was therefore appropriate for decision on motion for summary judgment. The trial court is affirmed on its grant of summary judgment for BankWest and Lynass on breach of the implied duty of good faith.

### FRAUD AND DECEIT CLAIM

SDCL 20–10–1 provides:

One who willfully deceives another, with intent to induce him to alter his position

to his injury or risk, is liable for any damage which he thereby suffers.

■ Questions of fraud and deceit are generally questions of fact and as such are to be determined by the jury. *Commercial Credit Equipment Corp. v. Johnson*, 87 S.D. 411, 209 N.W.2d 548 (1973). Summary judgment is proper, however, if Garrett produces no evidence of deceitful intent on BankWest's part when BankWest made the alleged contract to redeem the Garrett ranch from Hancock. *See Famous Brands, Inc. v. David Sherman Corp.*, 814 F.2d 517 (8th Cir.1987).

■ The evidence in the record shows that BankWest and Garrett discussed the possibility of redeeming the ranch from Hancock. The record also indicates that BankWest made an offer to Hancock and that this offer was refused. No evidence has been presented that would demonstrate that BankWest intended to induce Garrett to detrimentally alter his position at the time the redemption was discussed. In fact, the evidence indicates that BankWest *did* attempt to purchase the ranch and only abandoned the idea when an economically feasible price could not be reached.

Garrett has not produced any evidence [10] which would allow a trial court to infer fraud and deceit by BankWest. Summary

---

**10.** Garrett asserts that attorney Brian Meyer wrote a letter to Hancock in December 1984 which duped Garrett into relying upon BankWest to negotiate a settlement of the foreclosure. But attorney Meyer did not represent BankWest. Witness the beginning of this four page letter:

"Please be advised that I represent Glen and Betty Garrett of Onida, South Dakota...."

This letter goes on as follows:

On Tuesday, December 4, Glen Garrett and I met with Jack Lynass at BankWest in Pierre, South Dakota. The purpose of this meeting was to discuss formulation of a plan for Glen Garrett to work out of his present financial difficulties, and to arrange financing in such a matter that he could become current with the John Hancock loan. As a result of that meeting, a tentative proposal has been agreed upon to be submitted to John Hancock, as its participation in this proposal is necessary

And further in the letter:

6. John Hancock is also being asked to defer the payment which was due May 1, 1984,

together with interest thereon, to the end of the payment schedule.

/s/ Brian Meyer

And in conclusion:

Please review all of these proposals and respond as quickly as possible. The actual form of the items we have requested can be worked out to your satisfaction at a later date. If you have any questions, please feel free to call either myself or Jack Lynass at BankWest in Pierre, and we will attempt to answer them promptly.

The response from Hancock on December 11, 1984 went to attorney Meyer. Thus, it is clear that Garrett had legal advice during this period and their own counsel contacted Hancock about every topic, concern and issue which Garrett now attempts to lay at the feet of BankWest. And, when attorney Meyer received Hancock's rejection, as Garrett's attorney, he knew (and thus Garrett legally knew) the exact decision, posture and attitude of Hancock. *Tri–State Refining v. Apaloosa Co.*, 452 N.W.2d 104, 107 (S.D.1990).

judgment was therefore proper on this issue.

### PROMISSORY ESTOPPEL CLAIM

Garrett argues that representations allegedly made by BankWest regarding the Hancock redemption and lease-back induced him to liquidate some assets. This inducement, according to Garrett, invokes the doctrine of promissory estoppel precluding BankWest from denying the existence of a contract.

█ Promissory estoppel may be invoked where a promisee alters his position to his detriment in the reasonable belief that a promise would be performed. *Minor v. Sully Buttes School Dist. No. 58–2,* 345 N.W.2d 48, 51 (S.D.1984). To apply the doctrine of promissory estoppel, the trial court must find: 1) the detriment suffered in reliance must be substantial in an economic sense; 2) the loss to the promisee must have been foreseeable by the promisor; and 3) the promisee must have acted reasonably in justifiable reliance on the promise made. *Id.*

█ Estoppel depends on the facts of each case and ordinarily presents a question for the jury. *Brenner v. Nordby,* 306 N.W.2d 126 (Minn.1981). When the exact nature of the representations and the reasonableness of the reliance upon them are disputed, the issue of estoppel should be presented to a fact finder. *Id.* In addition, summary judgment is not proper where a state of mind is involved. *Britt v. City of Sioux Falls,* 291 N.W.2d 784 (S.D.1980).

█ The exact nature of the representations made by BankWest and Lynass are in dispute. Garrett claims that BankWest agreed to redeem the ranch from Hancock and lease it back to him, and that he relied on this alleged agreement to his detriment by liquidating some of his assets. Ban-

kWest, on the other hand, claims that there never was a definite agreement to redeem the property.

The trial court found as a matter of law that Garrett could not have reasonably acted in justifiable reliance upon alleged representations of BankWest. We agree with the trial court. Previously we have found that Garrett and BankWest had no agreement about the redemption because the terms were so vague, uncertain and unsettled. Garrett thought then and now argues that BankWest would expend any sum of money to redeem the Hancock mortgage. This is not a reasonable position under the circumstances.

These representations were made at a time after BankWest had brought Garrett into the bank in late 1983 and a mutual discussion ensued about the financial situation both were facing. After preparing a detailed cash flow statement and memorandum of understanding, Garrett would now have the court believe that it was appropriate to act upon vague, and in many respects, non-existent terms of an oral agreement. Also, Garrett assumed there were adequate funds to pay both Hancock and BankWest; thus, there were funds to pay BankWest if it assumed the Hancock debt. But during this time (April–May 1984), the facts, not assumptions, were telling Garrett that he could not even handle the Hancock debt. Garrett cannot ignore what he knew and then claim ignorance of the facts. Garrett made the request for money to pay Hancock and was turned down because there had been a shortfall of cash after the sale of grain in early 1984. This should have warned Garrett that the funds were not to be.

Finally, Garrett ignores the only evidence [11] in the record about the land value of the ranch. Since the Hancock loan, the land values dropped dramatically decreas-

11. In resistance to this fact of land value Garrett filed an affidavit of Floyd A. Rummel, Jr. which stated that:

> Mr. Richter (a former BankWest employee) told me on this occasion the Garretts had lost their farm because BankWest had not honored a commitment it had made....

Neither the commitment nor the manner of its breach is explained by the Rummel affidavit. It is wholly nonspecific and inconclusive. It makes no mention of land values. Thus, it is inadequate and insufficient. *Bourk v. Iseman Mobile Homes, etc.,* 316 N.W.2d 343 (1982); *Western Cas. & Sur. Co. v. Gridley,* 362 N.W.2d 100 (S.D.1985).

ing to almost one-half of the former value. During this time the debt remained fully constant, dropping when grain or livestock was sold and the earnings applied to the loans and increasing when operating capital was needed. Under this final circumstance it is difficult to conclude that Garrett's conduct was reasonable and we find it otherwise. No party can ignore the clear and obvious.

Garrett cites *Yankton Production Credit Ass'n v. Larsen,* 215 Neb. 610, 365 N.W.2d 430 (1985) in support of his claim for promissory estoppel. The law in Nebraska is almost identical to the South Dakota law on promissory estoppel, i.e., the promise must be such that the promisor would reasonably expect to induce action or forbearance on the part of another. However, the facts are different because the promissory estoppel claim was based upon the failure to loan *all* the balance of these loans and a denial of a future line of credit, issues this court has previously decided in favor of BankWest. Garrett also cites *Production Credit Assn. of Alma v. Halverson,* 386 N.W.2d 905 (N.D.1986). This case is essentially a procedural decision which recites that if material issues of fact exist, summary judgment should not be granted. We agree with the law, but disagree that the facts of the North Dakota

case compel a different decision here where we feel Garrett's reliance to be unreasonable. Finally Garrett cites *White v. Production Credit Ass'n,* 76 Mich.App. 191, 256 N.W.2d 436 (1977) where the PCA promised a loan, received the loan documents and land mortgages and, after the irrigation system was installed, refused to loan the money. The Michigan Court held that the reliance was justified. While we also agree with the Michigan decision under the facts presented, we again repeat that Garrett's reliance was not reasonable in light of the circumstances. Thus, the trial court's decision in granting summary judgment is affirmed.

WUEST, C.J., MORGAN and HENDERSON, JJ., and YOUNG, Circuit Judge, concur.

YOUNG, Circuit Judge, sitting for SABERS, J., disqualified.

KEAN, Circuit Judge, sitting for MILLER, J., disqualified.