_____

No. 95-2937
No. 95-3000
_____

Taylor Equipment, Inc.,           *
doing business as Midcon          *
Equipment  Company,               *
                                  *
    Plaintiff-Appellee/           *
    Cross Appellant,              *   Appeal from the United States
                                  *   District Court for the
    v.                            *   District of South Dakota.
                                  *
John Deere Company; John Deere    *
Industrial Equipment Company,     *
                                  *
    Defendants-Appellants/        *
    Cross Appellees.              *

                              _____

            Submitted:  June 12, 1996

                Filed:  October 18, 1996
                              _____

Before LOKEN, J. GIBSON, and HANSEN, Circuit Judges.
                              _____

LOKEN, Circuit Judge.

     Deere & Company (formerly John Deere Co.) and its subsidiary, John
Deere Industrial Equipment Company (collectively, "Deere"), appeal a
judgment in favor of Deere's former industrial equipment dealer, Midcon
Equipment Company ("Midcon").  The judgment was entered after a jury found
that Deere breached the implied covenant of good faith and fair dealing
when it refused to approve Midcon's proposed assignment of its dealership
to a willing buyer, forcing Midcon's owners to sell the business to other
approved buyers for $1,715,000 less.  The dealer contract provided that
Midcon could not assign its dealership "without the prior written consent
of [Deere]."  Because the implied covenant cannot override this

express term of the contract, and because there was no proof that Deere failed to exercise "honesty in fact," we reverse.

## I. Factual Background.

Deere manufactures construction and industrial equipment which it sells to independent dealers who sell or lease the equipment to end users. Deere dealers buy and sell parts and used equipment and service customer equipment. Because construction and industrial equipment is expensive, Deere provides its dealers "floor plan" financing -- the dealer must take title to a piece of equipment, such as a $100,000 road grader, upon its delivery into inventory, but the dealer does not pay Deere until it sells or leases the equipment, and it pays no interest on this credit transaction for the first nine months after delivery. Given this financial stake in its dealers, Deere screens prospective dealers for financial strength and adequate capitalization.

Midcon was a long time Deere dealer in Sioux Falls, South Dakota, and Sioux City, Iowa. This controversy began in 1990 when Deere discovered that Midcon had sold $370,000 in equipment "out of trust" by failing to timely pay Deere after the sales. The dealer contract between Deere and Midcon provided that Deere could terminate immediately for cause (defined to include defaults such as selling equipment out of trust), and that either party could terminate without cause upon one hundred twenty days written notice. Deere notified Midcon's owners, Paul and Cecelia Taylor, that Midcon would be terminated because of these serious defaults. However, in lieu of immediate termination, Deere advised that it would allow Midcon to continue as a dealer in good standing for up to eighteen months while the Taylors attempted to locate a buyer. The contract further provided that it "cannot be assigned by the Dealer without prior written consent of [Deere]."

In the fall of 1991, Midcon entered into an "agreement in principle" to sell nearly all its assets to Interstate Companies of Minnesota, Inc. ("Interstate"). This tentative agreement was subject to a number of contingencies, including Deere's consent to the assignment of Midcon's dealer rights to Interstate. Though Deere had approved Interstate's acquisitions of Deere dealers in Montana and Des Moines, Iowa, in 1987 and 1989, Deere notified Interstate that it would not approve this assignment unless Interstate enhanced its financial strength with additional equity capital. Interstate declined to do so, Deere refused to approve the assignment, and Midcon's sale to Interstate fell through. In 1992, with Deere's approval of the purchasers as successor dealers, the Taylors sold most of Midcon's Sioux Falls assets to Midwest Machinery, Inc. ("Midwest"), and most of the Sioux City assets to Swaney Equipment Co. ("Swaney"), on substantially less favorable terms than Interstate had previously offered.

## II. Procedural History.

Midcon then commenced this action, alleging wrongful cancellation under the South Dakota equipment dealer statute, S.D.C.L. §§ 37-5-3 and 4, and breach of the implied covenant of good faith and fair dealing, when Deere refused to approve the assignment to Interstate. Deere counterclaimed, alleging that Midcon had fraudulently obtained government customer discounts.

The district court summarily dismissed Midcon's wrongful cancellation claim because the dealership was not cancelled, but it denied Deere summary judgment on the breach of covenant claim. Prior to trial of that claim, the court severed Deere's fraud counterclaim for separate trial. It also granted Midcon's motion *in limine* to preclude evidence regarding Midcon's sales out of trust and Deere's intended termination on the ground that this evidence was irrelevant and unfairly prejudicial after dismissal of the wrongful cancellation claim. The court ruled that the sole

issue at trial would be whether Deere acted in good faith when it refused to approve assignment of Midcon's contract to Interstate.

Although Deere had not told Paul Taylor why it refused to approve the proposed assignment,[1] discovery revealed Deere correspondence conditioning approval on Interstate agreeing to enhance its equity capital. At trial, Midcon's theory was that this demand was pretextual -- in fact, Deere had forced Midcon to sell its businesses to two "key dealers," Midwest and Swaney, to further Deere's secret plan to "rationalize" its dealer network by eliminating fifty to one hundred small dealers during the 1990's. Deere countered that the refusal was in fact based upon its good faith, rational concern over Interstate's financial ability to expand in this fashion. Midcon responded with evidence that Deere's equity capital demand was unusual and unreasonable. The jury obviously credited Midcon's pretext theory.[2]

---

[1]When pressed by Taylor, Deere representatives told him to ask Interstate why it was not approved. This was an appropriate response since Deere's communications with Interstate had involved that company's confidential financial information.

[2]Early in the trial, Paul Taylor testified: "when Deere had put a certain amount of pressure on me, I decided that I would sell the business." Deere argued that Midcon thereby opened up the issue of its sales out of trust, but the district court adhered to its earlier motion *in limine* ruling. This ruling left the jury free to infer that Deere "pressured" Taylor as part of its secret plan to eliminate small dealers, not because Midcon had breached its dealer contract. The ruling also precluded Deere from explaining why Taylor did not have the option of refusing to sell the business if he found the Midwest and Swaney purchase offers unattractive. Finally, the ruling foreclosed Deere from putting its own actions in context, which is critical when a party's "honesty in fact" is at issue. Indeed, the district court even barred Deere from introducing evidence of Interstate's later financial troubles, evidence that would have substantiated the concerns that Deere contended were the reason for its refusal to approve assignment of the Midcon dealerships to Interstate. These evidentiary rulings left Deere to defend a claim of bad faith with one hand tied behind its back. Had we not concluded that Midcon's breach of covenant claim fails as a matter of law, we would have reversed and remanded for a new trial on this ground.

The jury awarded Midcon $1,715,710 in compensatory damages. The district court awarded $381,240.55 in prejudgment interest and denied Deere's alternative motions for judgment as a matter of law or a new trial. On appeal, Deere argues (1) it is entitled to judgment as a matter of law on Midcon's implied covenant claim; (2) the district court erred in excluding evidence of Midcon's sales out of trust and government discount fraud, and Interstate's subsequent financial woes; (3) error in the jury instruction on "good faith"; and (4) improper damages. In its conditional cross-appeal, Midcon argues that we should reinstate the claim for wrongful cancellation if we reverse the judgment for breach of the implied covenant. Given our interpretation of controlling South Dakota law,[3] we need only address the first and last issues.

### III.  The Implied Covenant Claim.

The district court concluded that "the South Dakota Supreme Court would impose on [Deere] a duty to act reasonably in deciding whether to consent to a proposed dealership transfer." We review the court's construction of state law *de novo*. See <u>Pate v. National Fund Raising Consultants, Inc.</u>, 20 F.3d 341 (8th Cir. 1994). Application of the implied covenant is a matter of contract interpretation, <u>Cambee's Furniture, Inc. v. Doughboy Rec., Inc.</u>, 825 F. 2d 167, 175 (8th Cir. 1987) (applying South Dakota law), a question we also review *de novo*. <u>Dirks v. Sioux Valley Empire Elec. Ass'n, Inc.</u>, 450 N.W.2d 426, 427-28 (S.D. 1990).

### A.

The Supreme Court of South Dakota recently held that South Dakota law implies a covenant of good faith and fair dealing into

---

[3]Neither party challenges the district court's decision to apply South Dakota law, and we do not examine that issue *sua sponte*. See <u>Kostelec v. State Farm Fire & Cas. Co.</u>, 64 F.3d 1220, 1224 (8th Cir. 1995).

every contract.  See Garrett v. BankWest, Inc., 459 N.W.2d 833, 841 & n.7 (S.D. 1990).  This covenant affords only contract remedies; there is no independent tort for its breach.  Moreover, "good faith is not a limitless duty or obligation.  The implied obligation must arise from the language used [in the contract] or it must be indispensable to effectuate the intention of the parties."  Id. at 841-42 (quotation omitted).  The Court in Garrett adopted for all contracts the definition of "good faith" found in South Dakota's uniform commercial code -- "honesty in fact in the conduct or transaction concerned."  S.D.C.L. § 57A-1-201(19).

Though every contract includes the implied covenant, it does not affect every contract term.  The covenant is "a method to fill gaps" in a contract.  It has "nothing to do with the enforcement of terms actually negotiated" and therefore cannot "block use of terms that actually appear in the contract."  Continental Bank, N.A. v. Everett, 964 F.2d 701, 705 (7th Cir.), cert. denied, 506 U.S. 1035 (1992).  Where parties have addressed an issue in the contract, "no occasion to divine their intent or supply implied terms arises."  Cambee's, 825 F.2d at 175 n.13.

In Garrett, the Court declined to apply the implied covenant to compel a lender to extend credit when the contract's express terms did not require such action.  459 N.W.2d at 847.  Similarly, that Court has refused to "transplant[] the covenant of good faith and fair dealing into the foreign soil of the employment-at-will doctrine."  Breen v. Dakota Gear & Joint Co., 433 N.W.2d 221, 224 (S.D. 1988).  A claim that an employee was terminated in bad faith is fundamentally inconsistent with the concept of at-will employment.  Therefore, the implied covenant may not be used to restrict the employer's freedom to terminate.  See Poff v. Western Nat'l Mut. Ins. Co., 13 F.3d 1189, 1191 (8th Cir. 1994) (applying the same principle in Minnesota law).

Applying similar reasoning, many courts have held that the implied covenant may not be applied to limit a clear contractual provision allowing termination of the contract without cause. See Grand Light & Supply Co., Inc. v. Honeywell, Inc., 771 F.2d 672, 675, 679 (2d Cir. 1985); Triangle Min. Co. v. Stauffer Chem. Co., 753 F.2d 734, 739-40 (9th Cir. 1985); Cardinal Stone Co. v. Rival Mfg. Co., 669 F.2d 395, 396 (6th Cir. 1982); Corenswet, Inc. v. Amana Refrig., Inc., 594 F.2d 129, 138 (5th Cir.), cert. denied, 444 U.S. 938 (1979); Blalock Mach. & Equip. Co. v. Iowa Mfg. Co., 576 F. Supp. 774, 776-78 (N.D. Ga. 1983). See also General Aviation, Inc. v. Cessna Aircraft Co., 703 F. Supp. 637, 644 (W.D. Mich. 1988) (implied covenant may not restrict a party's right to refuse to renew an annual dealer agreement), rev'd in part on other grounds, 915 F.2d 1038 (6th Cir. 1990). The Deere-Midcon dealer contract was terminable by either party without cause. This suggests that Deere's right to disapprove an assignment of the contract was intended to be absolute, because Deere in any event would be free to terminate an unwanted successor without cause.[4]

This appeal involves a no-assignment-without-approval clause, rather than a termination clause. However, courts have also been reluctant to apply the implied covenant to block a party's exercise of its contractual right to withhold approval. In James v. Whirlpool Corp., 806 F. Supp. 835, 839 (E.D. Mo. 1992), for example, the contract provided that "[n]one of the rights or obligations under th[e] agreement shall be subject to assignment . . . without the prior written consent of [the manufacturer]." The court held that the implied covenant did not "override the express terms of the agreement" which "unmistakably" granted an

---

[4]In Cambee's, we held that a distributor contract silent as to duration contained an implied covenant that the distributor would not be terminated without cause "for a period sufficient to allow [the distributor] to recoup its investment." 825 F.2d at 175. However, the Deere-Midcon agreement was not silent as to duration. Moreover, Midcon had many years as a Deere dealer in which to recoup its initial investment.

unlimited right to disapprove assignments. Id. at 843-44. See also In re Bellanca Aircraft Corp., 850 F.2d 1275, 1285 (8th Cir. 1988) (U.C.C. good faith obligation imposes no duty not to unreasonably withhold consent to assign a contract right).

Similarly, in Hubbard Chevrolet Co. v. General Motors Corp., 873 F.2d 873, 877-78 (5th Cir.), cert. denied, 493 U.S. 978 (1989), the court held that the implied covenant had "no role to play" in a dispute over the manufacturer's refusal to approve a dealer's relocation. "[The contract] gave GM the authority to approve or disapprove relocation for its own reasons," the court explained; "we decline to allow a jury to reevaluate the wisdom of the parties' choice to leave relocation decisions to GM." Id. at 878. See also Tidmore Oil Co. v. BP Oil Co., 932 F.2d 1384, 1391 (11th Cir.) (no breach of the implied covenant where supplier refused to approve a jobber's expansion under a contract stating that the supplier "must approve each outlet"), cert. denied, 502 U.S. 925 (1991).

Were the Supreme Court of South Dakota to apply the holdings in these cases to this fact setting, it is clear that Midcon's implied covenant claim would fail as a matter of law. The purpose of the implied covenant is to honor the parties' *justified* expectations. Garrett, 459 N.W.2d at 846. Absent contractual limitation, Deere has an absolute right to choose its equipment dealers. Midcon's dealer contract granted Deere an express, unrestricted right to disapprove a proposed assignment of Midcon's contract rights.[5] This contract term gave Midcon no justified expectation that Deere was agreeing to surrender its absolute right to choose Midcon's successor. Instead, the no-assignment-without-

---

[5]See Cunningham Implement Co. v. Deere & Co., No. C7-95-1148, 1995 WL 697555 (Minn. App., Nov. 28, 1995) (unpublished): "Deere left nothing to implication . . . . [Denial of approval] was Deere's contract right."

-8-

Deere-approval term *preserved* that right.[6]  Cf. Massey v. Tandy Corp., 987 F.2d 1307, 1309-10 (8th Cir. 1993); Abbott v. Amoco Oil Co., 619 N.E.2d 789, 796 (Ill. App.) ("the dealers cannot complain when Amoco merely exercises the discretion the dealers allowed Amoco to possess"), appeal denied, 624 N.E.2d 804 (Ill. 1993).

**B.**

There is another line of cases that suggest some role, albeit a limited role, for the implied covenant in a dispute involving exercise of a contractual right to disapprove assignment of a dealer contract.  In Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1357 (7th Cir. 1990), the court explained:  "'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of [the contract's] drafting, and which therefore was not resolved explicitly by the parties."  The Seventh Circuit further explained this concept in Original Great Amer. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd., 970 F.2d 273, 280 (7th Cir. 1992):

> Contract law imposes a duty, not to "be reasonable," but to avoid taking advantage of gaps in a contract in order to exploit the vulnerabilities that arise when contractual performance is sequential rather than simultaneous. Suppose A hires B to paint his portrait to his satisfaction, and B paints it and A in fact is satisfied but says he is not in the hope of chivvying down the agreed-upon price . . . . This . . . would be bad faith, not because any provision of the contract was

---

[6]The provision is consistent with general contract principles in that it confirms the parties' understanding that Midcon's rights as a Deere dealer fell within the broad class of contract rights that are not assignable without the other party's consent because "they are coupled with liabilities, or . . . involve a relationship of personal credit and confidence."  Green v. Camlin, 92 S.E.2d 125, 127 (S.C. 1956); see Berliner Foods Corp. v. Pillsbury Co., 633 F. Supp. 557 (D. Md. 1986); Jennings v. Foremost Dairies, Inc., 235 N.Y.S.2d 566, 573 (N.Y. Sup. Ct. 1962) (dealer contract).

unreasonable and had to be reformed but because a provision had been invoked dishonestly to achieve a purpose contrary to that for which the contract had been made.  The same would be true here, we may assume, if . . . the Cookie Company had tried to appropriate the value [the Sigels] had created by canceling the franchise on a pretext . . . utterly trivial violations of the contract that the company would have overlooked but for its desire to take advantage of the Sigels' vulnerable position. (Citations omitted.)

Under this interpretation of the implied covenant, Deere would be liable if it *dishonestly* withheld approval of a proposed assignment, but not if its decision was simply unreasonable.  This interpretation is consistent with Garrett's adoption of the U.C.C. standard, "honesty in fact."  It is inconsistent with the district court's imposition of a duty to act "reasonably."[7]

We are frankly uncertain whether the Supreme Court of South Dakota would hold that the implied covenant may not restrict an unlimited contractual right of approval, following cases such as Grand Light & Supply and James v. Whirlpool, or whether it would follow the above-quoted Seventh Circuit decisions and hold that the implied covenant does bar dishonest exercise of an otherwise absolute right to disapprove.  But we need not resolve that uncertainty in this case because Midcon presented no evidence that Deere acted *dishonestly* when it disapproved the proposed assignment to Interstate.

---

[7]The district court instructed the jury that the implied covenant required Deere "to act fairly and reasonably," and that "[s]ubterfuge and evasions violate the obligation of good faith . . . even though the actor believes its conduct to be justified." These instructions erroneously expanded the implied covenant far beyond "honesty in fact."  In particular, the instruction regarding "subterfuge and evasions" has no place in a case of this kind. Deere's dealer strategies and its evaluation of Interstate's financial statements involved sensitive business information.  The court should not have permitted the jury to find Deere guilty of "subterfuge and evasions" because it failed to disclose such information when it disapproved the assignment to Interstate.

Midcon's case was built upon pretext and unreasonableness.  Deere's stated reason for disapproving -- Interstate's inadequate equity capital -- and the alleged secret reason -- a long term plan to consolidate dealerships in the hands of key dealers -- are both legitimate business reasons for not approving Interstate as Midcon's successor.  Midcon had no evidence of Deere's "dishonesty in fact" -- an intent to take "opportunistic advantage" of Midcon's need to sell for any reason other than Deere's business interests in choosing its dealers, interests expressly protected in the contract.  Thus, Deere is also entitled to judgment as a matter of law under this interpretation of the implied covenant.

## C.

The district court relied upon <u>Larese v. Creamland Dairies, Inc.</u>, 767 F.2d 716 (10th Cir. 1985), for its conclusion that the implied covenant imposed a duty on Deere to act reasonably.  In <u>Larese</u>, a franchise agreement prohibited assignment "without the prior written consent of" Creamland and declared any unapproved transfer "null and without effect." <u>Id</u>. at 717.  Applying Colorado law, the court held that the implied covenant required that the franchisor not unreasonably withhold consent. In a passage quoted approvingly by the district court, the court in <u>Larese</u> opined that "the franchisor must bargain for a provision expressly granting the right to withhold consent unreasonably, to insure that the franchisee is put on notice." <u>Id</u>. at 718.  We disagree.

The normal meaning of the approval clause in the Deere-Midcon agreement is that Deere has an unrestricted right to withhold approval, at least if it acts honestly.  As review of any contract drafting treatise will confirm, if the parties to a contract agree that the discretion granted under such an approval clause should be more limited, their draftsman will insert a provision stating that "consent to assignment shall not be unreasonably withheld," like the contract at issue in <u>Anheuser-Busch, Inc. v. Natural Bev.</u>

Distribs., 69 F.3d 337, 345 (9th Cir. 1995). See generally R.A. Feldman, Drafting Effective Contracts: A Practitioner's Guide § 5-J.2[a] (1996 Supp.). Unlike litigation, drafting a contract is a positive exercise among parties contemplating beneficial, harmonious relations. No experienced draftsman would think of inserting a provision to the effect that "this clause permits Party A to act unreasonably." Thus, we decline to follow Larese because it would impose an unrealistic drafting burden on parties who intend to create an unrestricted approval clause whose exercise will not be supplanted by a jury's notion of reasonableness.

"[I]n commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves." James Baird Co. v. Gimbel Bros., Inc., 64 F.2d 344, 346 (2d Cir. 1933) (L. Hand, J.). Paul Taylor was an experienced businessman who had no justified expectation that Midcon's dealer contract would permit him to second-guess Deere's choice of Midcon's successor. Accordingly, Midcon's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law under any reasonable application of the implied covenant defined in Garrett.

### III.  The Wrongful Cancellation Claim.

Midcon argues that the district court erred in summarily dismissing, without discovery, its claim that Deere cancelled the dealer contract in violation of S.D.C.L. §§ 37-5-3 and 37-5-4. Section 37-5-3 provides that a construction equipment manufacturer may not "unfairly, without due regard to the equities of the dealer and without just provocation . . . cancel the franchise of any dealer." Section 37-5-4 creates a cause of action for damages resulting from a wrongful cancellation.

Midcon argues that Deere could be found to have constructively cancelled the dealerships in early 1991 when Deere advised that

Midcon was $370,000 out of trust and would be terminated if the dealerships were not sold within eighteen months. However, Midcon's brief acknowledged that it continued to be an active Deere dealer until June 1992 when the businesses were sold to Midwest and Swaney.[8] Indeed, Midcon could take no other position if it wished to pursue its implied covenant claim because termination of the dealerships would have destroyed Midcon's power to assign them. The plain language of § 37-5-3 limits its scope to instances of "unfair cancellation." In these circumstances, the district court properly perceived the factual inconsistency in Midcon's claims and dismissed a wrongful cancellation claim that was fundamentally at odds with the events at issue.[9]

The judgment of the district court is reversed and the case is remanded with instructions to enter a judgment in favor of defendants dismissing all of Midcon's claims.

JOHN R. GIBSON, Circuit Judge, dissenting.

I respectfully dissent.

---

[8]Midcon has no authority for its constructive cancellation theory. It cites Groseth Int'l, Inc. v. Tenneco, Inc., 410 N.W.2d 159 (S.D. 1987), but there the dealer's franchise was in fact cancelled. Unlike the dealer in Groseth, Midcon continued to serve as a Deere dealer after the "constructive cancellation" and was able to sell on-going businesses. See also Zeno Buick-GMC, Inc. v. GMC Truck and Coach, 844 F. Supp. 1340, 1351 (E.D. Ark. 1992) (Kansas statute does not apply to constructive franchise terminations), aff'd, 9 F.3d 115 (8th Cir. 1993); Carlock v. Pillsbury Co., 719 F. Supp. 791, 852 (D. Minn. 1989) (no "constructive termination" claim under Washington Franchise Investment Protection Act).

[9]Midcon's reply brief asserts for the first time that Midcon is entitled to pursue a claim that Deere violated S.D.C.L. § 37-5-2 by threatening cancellation. However, this claim was not pleaded in Midcon's complaint nor raised in its notice of cross-appeal.

-13-

I believe that the court today takes a far too narrow view of South Dakota law with respect to Deere's refusal to approve the purchasers of Midcon's business.

I must first say that were we considering adoption of a federal rule with respect to the covenant of good faith, I would join much of the court's opinion today with substantial enthusiasm. The issue, however, is far more narrow; namely, a prediction of the rule that would be applied by the South Dakota Supreme Court.

The two district judges involved in this case denied motions for summary judgment with respect to the implied covenant of good faith issue. The first such decision was articulated in open court after considerable argument, relying on this court's earlier decision in Cambee's Furniture, Inc. v. Doughboy Rec., Inc., 825 F.2d 167 (8th Cir. 1987), based on South Dakota law.

The second judge, in a thoughtful and detailed analysis of several South Dakota cases on the implied covenant of good faith undertaken by the court, concluded:

> In this case, the implied covenant of good faith and fair dealing arises from the language of the assignment clause expressly stated in the written dealership agreements. See Nelson v. Web Water Dev. Ass'n, Inc., 507 N.W.2d 691, 698 (S.D. 1993) (reversing grant of summary judgment on issue of breach of contractual good faith and fair dealing where high court determined a valid employment contract existed). Cf. Garrett [v. BankWest, Inc.,] 459 N.W.2d [833,] 844 [(S.D. 1990)], (holding that no implied covenant arose because no contracts existed). Although the South Dakota Supreme Court has not decided a similar case, this Court concludes, based on Nelson, Garrett and Groseth [Int'l, Inc. v. Tenneco, Inc., 410 N.W.2d 159 (S.D. 1987)], that, construing the contract language used here, the South Dakota Supreme Court would impose on the franchisor a duty to act reasonably in deciding whether to consent to a proposed dealership transfer. See Larese, 767 F.2d [716,] 716-17 [(10th Cir. 1985)].

-14-

The court continued, reasoning that there was no evidence that the assignment clause resulted from arms-length negotiation between the parties. In addition, Taylor testified in his deposition that long after the agreements were reached, Deere executive, Gene Griffith, had told Taylor "several times" that he would not be unreasonable about [approving or disapproving transfer of the dealership agreements]. The district judge stated:

> [U]nder the contract language as written, the implied covenant of good faith and fair dealing is necessary as an aid to interpreting the assignment clause. Plaintiff Midcon had a reasonable expectation that defendant would exercise good faith and fair dealing in making its decision as to whether dealership agreements could be transferred.

Later, in ruling on post-trial motions, the district judge referred to the earlier order on the motion for summary judgment and ordered that the judgment should stand. It rejected Deere's argument that the reasons it gave for not approving Interstate as a purchaser presented questions of law rather than questions of fact. The judge, viewing the evidence in the light most favorable to the plaintiff, held there was sufficient evidence from which the jury could find that Deere's actions were not reasonable.

The jury was instructed that the obligation of good faith and fair dealing is implied in the expressed written terms of the contract, which provided that Midcon could not transfer its dealership agreements to another dealer "without the express written consent of Deere Industrial." The instruction continued:

> The implied obligation of good faith and fair dealing required Deere Industrial to exercise good faith toward Midcon and to act fairly and reasonably when Midcon requested Deere Industrial's permission to assign its dealership agreements in connection with the sale of Midcon to Interstate Companies.

Good faith means honesty in fact in the conduct or transaction concerned.

Subterfuges and evasions violate the obligation of good faith in performance of a contract even though the actor believes its conduct to be justified.

The jury was further instructed that Deere was entitled to exercise its business judgment, and that error in business judgment was not sufficient to establish lack of good faith and fair dealing.

The court's opinion today first makes reference to the Garrett case and its adoption of the implied covenant of good faith, but then proceeds to loose a volley of federal cases from other circuits and other districts holding that the implied covenant did not restrict an employer's freedom to terminate an employee at will, or to terminate a contract. Next, the court's opinion refers to cases dealing with the no-assignment-without-approval clauses that are based on law from states other than South Dakota.

Finally, the court considers two Seventh Circuit cases, Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351 (7th Cir. 1990), and Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd., 970 F.2d 273 (7th Cir. 1992), slip. op. at 9, both based upon Illinois law, that involve exercise of a contractual right to disapprove assignment of a dealer contract. From Cookie, the court reasons that the Seventh Circuit's interpretation of Illinois law would point to liability if Deere dishonestly withheld approval of the proposed assignment, but not if the withholding of approval was simply unreasonable. It concludes that this interpretation is consistent with the adoption of the U.C.C. standard in Garrett v. Bankwest, Inc., 459 N.W. 2d 833, 841 (S.D. 1990), which is "honesty in fact," but is inconsistent with the district court's imposition of a duty to act reasonably. Because it concludes that Midcon presented no evidence

-16-

that Deere acted dishonestly when it disapproved the proposed assignment, it reverses the district court.

Notably, the court treats Garrett in a most cursory fashion, paying no heed to Garrett's discussion of the basis of the adoption of the good faith rule, and in part coupling Garrett with reference to termination of at-will employment, which is inapposite. By failing to carefully examine the foundation on which Garrett sits, and by failing to consider other relevant South Dakota precedent, however, the court fails to focus on the central issue of the case -- whether the South Dakota courts would interpret the covenant of good faith to incorporate acting reasonably.

The court today concedes that the South Dakota courts have not provided a clear answer to the issue before us. Nonetheless, there is no question but that in this diversity case we must apply the law of South Dakota, and if the issue has not been decided by its courts, our obligation is to predict the manner in which the issue will be decided.

The district court pointed to Garrett, which is the first decision that explicitly adopted the implied covenant of good faith. Garrett referred not only to the provisions of the U.C.C., § 1-203 as adopted by South Dakota,[10] but also made numerous references to the Restatement (Second) of Contracts § 205 (1981). Garrett stated:

> Good faith is derived from the transaction and conduct of the parties. Its meaning varies with the context and emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other

---

[10]"Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement." S.D. Codified Laws § 57A-1-203 (1988). Good faith is defined as "honesty in fact in the conduct or transaction concerned." S.D. Codified Laws § 57A-1-201 (1988).

party. Restatement (Second) of Contracts, [§ 205], Comment a. But good faith is not a limitless duty or obligation. The implied obligation "must arise from the language used or it must be indispensable to effectuate the intention of the parties." Sessions, Inc. v. Morton, 491 F.2d 854, 857 (9th Cir. 1974).

459 N.W.2d at 841.

In its detailed analysis of the facts, Garrett quotes:

[G]ood faith is an `excluder.' It is a phrase without general meaning (or meanings) of its own and serves to exclude a wide range of heterogeneous forms of bad faith. In a particular context the phrase takes on specific meaning, but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out.

Id. at 845 (quoting Robert S. Summers, Good Faith in General Contract Law and the Sales Provision of the Uniform Commercial Code, 54 Va. L. Rev. 195, 201 (1968)). Garrett continues:

Professor Summers suggests some categories to identify bad faith in performance of a contract including: evasion of the spirit of the deal; abuse of power to determine compliance; and, interference with or failure to cooperate in the other party's performance. [Summers at 201.] Restatement (Second) of Contracts, [§ 205] Comment e. And, as noted in Sessions, Inc. v. Morton, supra, the good faith must arise from the language used or be indispensable to effectuate the intention of the parties.

Id. Garrett held that, though every contract contains an implied covenant of good faith, there had been no violation of the covenant because there had been no violation of the spirit of the contract or justified expectations of the parties, and no abuse of power to determine compliance, nor failure to cooperate in the performance. Id. at 846.

Nelson v. Web Water Dev. Ass'n, 507 N.W.2d 691, 698 (S.D. 1993), is further evidence that the South Dakota Supreme Court will continue to apply the doctrine of implied good faith as it did in Garrett. Nelson directly quoted Garrett's definition of the implied covenant of good faith and fair dealing and again referred specifically to the Restatement of Contracts. See 507 N.W.2d at 698. The district court referred to and relied on both Nelson and Garrett in its determination that the reasonableness of Deere's actions is a good faith issue.

Because of the Supreme Court of South Dakota's consistent reliance on the Restatement (Second) of Contracts, I am persuaded that the court would look further to the Restatement in ascertaining whether reasonableness falls within the definition of good faith. The lengthy definition given to good faith in Garrett was not considered to be all-inclusive. Indeed, Garrett stated that the meaning of good faith "varies with the context and emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Garrett, 459 N.W.2d at 841. The Restatement of Contracts phrases the duty as one of good faith and fair dealing in the performance and enforcement of the contracts. Restatement § 205 comment a, in discussing the meaning of good faith, refers to honesty in fact, but continues:

> Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.

Restatement (Second) of Contracts § 205 cmt. a (emphasis added).

Comment e, specifically referred to in Garrett, further defines the obligation of good faith in the enforcement of

-19-

contracts. The obligation of good faith "also extends to dealing which is candid but unfair, such as taking advantage of the necessitous circumstances of the other party to extort a modification of a contract for the sale of goods without legitimate commercial reason." Restatement (Second) of Contracts § 205 cmt. e.

Finally, it must be observed that the court instructed the jury to consider not only whether Deere had acted fairly and reasonably with Midcon concerning permission to assign, but also that subterfuges and evasions violate the obligation of good faith.
This instruction is directly supported by Comment d of the Restatement:

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further; bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which had been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

Restatement (Second) of Contracts § 205 cmt. d.

I believe that the district court did not err in concluding from Nelson and Garrett that their reliance on section 205 of the Restatement of Contracts would support the conclusion that reasonableness, along with subterfuges and evasions, all terms enumerated in the Restatement comments, are issues properly to be considered by the jury in determining the issue of good faith. Further, the district court's reliance on Garrett and Nelson, and in turn the reference of those two cases to section 205 of the Restatement of Contracts, supports the district court's reference

to Larese, contrary to the extended arguments made by the court today.

While the court's comments today concerning the ruling on Midcon's motion in limine to preclude evidence regarding Midcon's sales out of trust and Deere's intended termination may be but dictum in view of its holding, just a few words are in order to explain why I believe the court also errs in this respect. Midcon's claim was pleaded in six counts. The district court dismissed five of these counts, including that for wrongful termination, at Deere's urging. At the hearing on this motion, Deere's counsel argued that no cancellation of the franchise had been alleged, but only "that Deere said you should find someone else to buy your business or we will terminate. We never got to the we will terminate part, because he did, in fact, find someone else to buy his businesses." Counsel continued to advocate that what had happened in this case was the resignation of a dealer after a buyer was found. Thus, the sole issue that was tried to the jury was the question of the implied covenant of good faith on refusal to approve the assignment. The district court explained that it excluded the evidence because it was prejudicial in light of the fact that Midcon's wrongful termination claim had been dismissed. In denying the post-trial motion for new trial on this ground, the district court referred to this order in the pretrial motions, and stated that Deere had provided no new evidence or argument to justify a reversal of these rulings and therefore denied relief. The trial judge has wide discretion in ruling on the admissibility of evidence, and its decisions thereon will not be disturbed unless there is a clear and prejudicial abuse of discretion. Robertson Oil Co. v. Phillips Petroleum Co., 930 F.2d 1342, 1346 (8th Cir. 1991), cert. denied, 114 S.Ct. 2120 (1994). I would not conclude that the district court abused its discretion in this matter.

I would affirm the judgment of the district court because I believe it to be based firmly on South Dakota law and an accurate prediction as to how South Dakota courts would decide the issue before us.

A true copy.

Attest:

    CLERK, U. S. OF APPEALS, EIGHTH CIRCUIT.